BURKE v. MONUMENTAL DIVISION, NO. 52, BROTHERHOOD OF LOCOMOTIVE ENGINEERS, et al.

(District Court, D. Maryland. August 12, 1919.)

1. **Trade unions ⊛4—Decision on question of jurisdiction of union tribunal is conclusive.**

A construction by the tribunals of the union of a section of the rules of the union prescribing the division of the union before which charges against a member should be tried is conclusive, since it did not go to any of the fundamental rights of the member.

2. **Removal of causes ⊛106—Objection that some defendants did not reside in district held waived.**

In a suit removed from a state court by a petition in which all the defendants joined, where plaintiff moved to remand only for the reason that no federal question was involved, both plaintiff and defendants had waived the objection that not all of the defendants resided in the district to which the suit was removed.

3. **Appearance ⊛24(7)—Objection to service by publication is waived by motion to dismiss and answer.**

The filing of a motion to dismiss the bill on other grounds and the subsequent filing of an answer waives the objection that nonresident defendants served by publication were not properly brought into court, and that point cannot be raised at the final hearing.

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Associations ⊚⇒11—Mandamus ⊚⇒125—Mandamus is not adequate remedy to restore to membership in unincorporated association.**

Mandamus will not issue to restore to membership a member of an unincorporated association who was illegally expelled, though it might issue if the association were incorporated, and therefore an expelled member of an unincorporated association may seek redress in equity.

**5. Beneficial associations ⊚⇒11—Right to recover benefits not adequate remedy for void expulsion.**

The fact that the rights to sick and death benefits, which were lost by the expulsion of a member, could be enforced in an action at law for such benefits after they accrued, if the expulsion was void, does not defeat the member's right to sue in equity to be restored to membership.

**6. Trade unions ⊚⇒9—Benefit associations and brotherhood held proper parties to suit to restore membership in division.**

In a suit to compel the restoration of plaintiff to membership in a division of a trade union, the benefit association of the division, the International Brotherhood of the union, and an incorporated mutual life and accident insurance association, whose privileges were extended only to members of the division, are directly concerned in the question whether the membership should be restored and are therefore proper parties to the bill even though they may not have been necessary parties.

**7. Trade unions ⊚⇒4—Failure to recover does not show dishonesty in bringing suit.**

The fact that a suit brought by a member of a trade union to enjoin a strike called by the officers of that union could not have been maintained does not establish that the suit was dishonestly instituted, and therefore in a subsequent suit to compel the restoration of a membership after expulsion for instituting the suit for injunction, the right to the injunction need not be determined, so long as the contentions made by plaintiff in that suit are not so patently bad as in themselves to suggest they were set up in bad faith.

**8. Trade unions ⊚⇒4—Rule held not to prohibit seeking redress in the courts.**

The rule of a trade union, imposing the penalty of expulsion on any member who by communication to railroad officials or others interfered with a grievance in the hands of a committee, will not be construed to prohibit a member from seeking redress in the courts, since the language does not suggest it had reference to legal proceedings, and an intention to deny access to the courts will not be presumed, but, if it be enforceable at all, must be unmistakably expressed.

**9. Trade unions ⊚⇒4—Seeking injunction against strike held not to violate rule against resort to courts.**

A trade union rule, prohibiting resort to the courts in any controversy arising within the organization for which the laws of the union provide a means of settlement, without having previously exhausted all remedies within the brotherhood, does not prohibit a member from seeking to enjoin a strike which he contended was called by the union officials without authority, where the strike was to begin within a few days, and the only redress within the brotherhood was by appeal to the next convention, which would not meet for 14 months.

**10. Trade unions ⊚⇒4—Expulsion on charge of resort to courts cannot be justified by proof member co-operated with employer to that end.**

Where the only charge presented against the member of a trade union was that he had resorted to the courts to prevent a strike called by the head of the union, which under the rules was not a sufficient ground for expulsion, the expulsion cannot be sustained on the ground that the member had cooperated with the employer in bringing such suit, in view of the union rule that the charges on which the member was brought to trial must be in writing.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by Dominic J. Burke against Monumental Division, No. 52, Brotherhood of Locomotive Engineers, and others, to compel defendants to restore plaintiff to membership in the Division. Decree ordered for plaintiff.

F. Howard Smith, of Baltimore, Md., and Cyrus G. Derr, of Reading, Pa., for plaintiff.

Arthur L. Jackson, of Baltimore, Md., for defendants.

ROSE, District Judge. In the year 1896 the plaintiff became a member of the defendant Monumental Division, No. 52, of the Brotherhood of Locomotive Engineers. Affiliated with it, and subject to its control, is the defendant the Mutual Aid & Benefit Association of Monumental Division, No. 52, of the Brotherhood of Locomotive Engineers. The division itself is a branch of the defendant the Grand International Brotherhood of Locomotive Engineers. Each is a voluntary unincorporated association. A fourth defendant, the Locomotive Engineers' Mutual Life & Accident Association, is a corporation of the state of Ohio. It is controlled by the Grand International Brotherhood. No one, not a member of some division of the latter, is eligible to membership in the former. One who ceases to be a member of the Brotherhood automatically at the end of a year is dropped by the Mutual Life & Accident Association.

The four defendants already mentioned will be called the Division, the Benefit Association, the Brotherhood, and the Insurance Association, respectively. The individual defendants are members or officers of one or more of the unincorporated associations, and are sued as representatives of the entire membership, which is numerous and scattered.

For many years plaintiff had been a member of the Benefit and of the Insurance Associations. He had paid considerable sums as dues and assessments. In the event of sickness, disability, accident, or death while a member, he was entitled to payments from them, the aggregate present value of the right, to which the parties agree, is upwards of $3,000. All of this he has lost, if his membership has been taken from him.

In June, 1916, the Brotherhood and the other organizations of train employees, each by an overwhelming vote of its members, authorized their chief executives to call a strike in the event of failure to secure a satisfactory adjustment of a long-standing demand for a basic eight-hour day, with pay at the rate of a time and a half for all overtime. The railroads and the trainmen could not agree, and the executives of their four Brotherhoods united in calling a nation-wide strike, to begin on Labor Day, 1916. Thereupon, at the instance of the President of the United States, Congress passed the Adamson Bill (Comp. St. §§ 8680a-8680d), and the strike order was recalled. The act was to go into effect on the 1st of January, 1917. The railroads claimed that it was unconstitutional, and in the closing days of 1916 filed numerous bills seeking to enjoin its enforcement.

Renewed threats to strike were made. The President again inter-

vened. He told the representatives of the men that he would do all that he could to expedite a final decision of the legal questions involved. For a while they rested satisfied with this assurance. A District Court promptly held the act void, and issued the injunction for which a railroad asked. An immediate appeal to the Supreme Court was taken. The case was there advanced, and was argued on January 8, 1917. The issues involved were of far-reaching importance. Some of them were new, or at least they so appeared to some of the justices, as well as to many of the public. We now know, from the various concurring and dissenting opinions which were ultimately filed, that the members of the court were not of one mind as to the answers which should be given to them. Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024. Time for consideration was necessarily taken. Railroads, trainmen, shippers, and the general public in the meanwhile were thinking about what would happen if the court should hold the act invalid. In Congress, in the press, and by various individuals and organizations, much was said in favor of making compulsory the arbitration of such differences between the railroads and their employees as might threaten an interruption of interstate transportation. The Brotherhood and its associates were strongly opposed to any legislation of this character. Nothing was done about it by the Sixty-Fourth Congress, which went out of existence on the 4th of March, 1917. The state of our relations with Germany made certain the speedy convening of its successor in extra session.

The defendant Stone, the Grand Chief of the Brotherhood, testifying in this case, explained that the heads of the four organizations of trainmen wanted to force the railroads to concede the basic eight-hour day and the time and a half for overtime, before Congress could get a chance to require the men to accept arbitration. They were of opinion that the authority to call a strike, voted them some nine months before, was still in force, and accordingly, on some day between the 5th and the 16th of March, 1917, they issued a call for a strike to begin on the evening of March 17th.

The plaintiff, who had been one of the small minority of the engineers who had voted against a strike, says he thought it particularly objectionable at the time and under the circumstances then existing. He believed that it would be disastrous to the Brotherhood, as well as to the railroads and the public. He was convinced that the Grand Chief had no right to call it, because in his opinion the power so to do, given by the vote of the preceding June, had expired when, subsequent to the passage of the Adamson Act, the strike ordered for September, 1916, was countermanded.

There is no reason to question that plaintiff truly stated his real views; but, had he been left to his own devices, it is not likely that he would have done more than grumble. As it turned out, he was destined to play a more important rôle. He worked for the Pennsylvania Railroad, which, faced by a strike which would probably involve almost all of its train crews, was seeking some way of warding off the danger.

All of the objections to the strike felt by plaintiff were prominent to the minds of the officers of the railroad. Like him, they had persuaded themselves that in calling a strike Grand Chief Stone was usurping a power which the rules of the Brotherhood withheld from him. They felt that this contention, brought properly before a court of competent jurisdiction, would receive serious consideration. The mischief which such a strike would do would be so great and so irreparable that almost any tribunal would be inclined to exercise its authority to forbid it until the objection could be fully heard and maturely thought over. In the meantime, much might happen.

But obviously the claim that the head of the Brotherhood was doing that which its law forbade would come with most force from one of its members, and it was at least possible that no one else could be heard to make it. The testimony in the case justifies the inference that those subordinate officials of the railroad, who came most closely in contact with the engineers, were instructed to look out for some one of them who was willing to ask that the strike be enjoined. At all events, in the forenoon of March 16, 1917, the plaintiff, while at work on his engine in Baltimore, was approached by his foreman and asked as to how he felt about the strike. He replied that he was opposed to it. In answer to a further question, he said he was ready to go to court to prevent it. He was at once relieved of his task, put upon the 12:05 p. m. train for Philadelphia, and upon his arrival at Broad Street station was taken to the offices of the railroad's legal department. After having been asked and having answered some questions, he was told that the bill of complaint would not be ready before the next morning, at which time he was requested to return. He did so, and on the morning of the 17th signed and swore to a printed bill of complaint, which was at once filed in the clerk's office of the District Court of the United States for the Eastern District of Pennsylvania. By it he prayed that the strike be enjoined.

About dawn on the morning of Monday, March 19th, the representatives of the railroads conceded the demands of the heads of the trainmen's organization. The issues which plaintiff had sought by his bill to raise thus became moot. Some of plaintiff's fellow members of the Division learned from the newspapers what he had done. They in consequence preferred a charge against him. In the end nothing came of this first complaint; subsequently it was renewed, and ended in the expulsion, which the plaintiff seeks to have annulled.

The charge upon which he was expelled was that during the concerted movement for an eight-hour day he had filed a bill in the United States District Court at Philadelphia against members of the Brotherhood, seeking to restrain them from taking part in a strike which had been voted by a majority of the members. It was alleged that such action was in violation of section 35 of the Standing Rules of the Brotherhood, and was conduct unbecoming a member, and was contrary to his obligations. Plaintiff appeared at the time and place fixed for his trial, but said that under section 58 of the Rules of the Brotherhood the Division had no jurisdiction over the offense charged, if it

was an offense, which he denied. The portion of the rules to which he referred provided that whenever a member of the Brotherhood, while out of the jurisdiction of his own division, conducted himself in a manner unbecoming a brother, the division nearest to the point where the offense was committed should put him on trial. If he is convicted, his sentence is certified to his division for execution.

[1] Whether his construction of this section, which does not go to any of his fundamental rights, and is concerned merely with the distribution of jurisdiction among the various tribunals of the Brotherhood, was correct or not, was a question upon which its determination against him is conclusive. He did not stop with refusing to submit to trial, for, while adhering to his position in that respect, he handed in a written statement of the reasons which had led him to bring the Philadelphia suit. As he declined to acknowledge the jurisdiction of the Division, he was directed to leave the room. After he had done so, and in his absence the trial proceeded. He was convicted and sentenced to expulsion. He appealed to the Grand Chief, and from that officer's affirmance of the action of the Division to the next triennial convention of the Brotherhood, which approved all that had been done against him, and added to his punishment the additional penalty of perpetual ineligibility for membership. He, having thus exhausted all possible means within the Brotherhood of securing the redress to which he considered himself to be entitled, brought this suit in the circuit court of Baltimore City, an equity court of the state of Maryland. Process against the Division, the Benefit Association, and such of the individual defendants as were residents of Maryland was issued, served, and returned in the usual way. Against the Brotherhood, the Insurance Association, and Grand Chief Stone an order of publication was prayed and made. Under it publication was had, and, as required by the statutes of Maryland, a copy of the order was actually served upon these defendants in Cleveland, Cuyahoga county, Ohio.

[2] All of the defendants united in a petition to remove the case to this court, on the ground that it arose under the laws of the United States, and it was sent here. The plaintiff asked for a remand, setting up that no federal question in the jurisdictional sense was involved. No objection was made that some of the defendants had been sued in a district in which they did not reside. It was thus waived by the plaintiff, as by their petition for removal it had been by the defendants.

The court, in passing upon the motion to remand, agreed with the plaintiff that the case made by this bill did not really turn upon the construction or application of the various acts of Congress therein referred to; but, as it did allege that the plaintiff had been expelled because he had exercised his constitutional and statutory right to bring suit in a court of the United States, a federal question was presented, whether the defendants would or would not have taken the same action, had he sought the aid of a state court. The remand was consequently denied.

[3] It was at this stage of the proceedings still open to those of the defendants who were nonresidents of Maryland, and who had never

within its limits been served with its process, to claim that they were not in court at all. Instead of so doing, they filed an elaborate motion to dismiss the bill, in which they made many objections to its sufficiency, some of them going to the merits of the plaintiff's case as set up by him; but they said nothing as to lack of due process, and on this matter they were equally silent in the lengthy answer which they subsequently submitted. The point was waived, and the attempt at the final hearing to make it came too late.

In the motion to dismiss the defendants said that the plaintiff had mistaken his remedy. He should have gone to a court of law:

[4] (1) Because, if he wished to be restored to membership, he should have asked for a mandamus. If the Division were incorporated, they might have been right. La Valle v. Société St. Jean Baptiste, 17 R. I. 680, 24 Atl. 467, 16 L. R. A. 392. As it was not, mandamus will not run, and plaintiff must seek redress in equity. Wrightson on Unincorporated Associations, 223; Martin's Modern Law of Labor Unions, § 220; Krause v. Sander, 66 Misc. Rep. 601, 122 N. Y. Supp. 54.

[5] (2) All that the plaintiff loses by his expulsion is the right, when the occasion arises, to sick, accident, or death benefits or pensions. Defendants argue that, if plaintiff's expulsion is void, as he says it is, he has not been hurt. When anything becomes due him or his estate, he or his representatives may sue for it, and the courts will disregard the attempted expulsion. Whether, as against the only defendants which would then be sued, it would be proper to do so, is by no means clear. They did not expel him. They have no jurisdiction to inquire whether he was or was not rightfully expelled, and yet, while he is living and in good health, they have a right to know whether they are entitled to demand dues and assessments from him, and are bound, if he is a member, so to conduct their affairs that they will be ready to pay him when misfortune entitles him to receive something from them. Besides, his rights to ask for anything may not mature for years. By that time, some of those who once knew most about the circumstances of his expulsion may be dead, and the memory of those who survive will be dimmed by time. Equity does not make laches a duty.

[6] The motions to dismiss set up that the Division was the only proper defendant. As it was unincorporated, plaintiff took the usual course of suing some of its officers and members, as representatives of all of them. Whether he was still a member of the Division directly concerned the Benefit Association, the Brotherhood, and the Insurance Association. They were all proper parties, even although it may not have been necessary to join them.

[7] All else relied upon in the motions to dismiss is in effect repeated in the answer, and goes to the merits of the case made, to the consideration of which it is now necessary to pass. From this discussion may be eliminated the greater number of the questions with which the pleadings concern themselves, as, for example, whether the calling of a strike in March, 1917, was brought about by an unlawful combination to which the defendant Stone was a party; that in calling it he violated the rules of the Brotherhood, because, among other reasons, the vote of

June, 1916, was in March, 1917, no longer effective; that the strike order of the latter date was in pursuance of an unlawful conspiracy to frustrate the Adamson Act; that under the Newlands Act of July 15, 1913 (Comp. St. §§ 8666–8676) the Brotherhood should have consented to arbitrate its dispute with the railroads. All these were once important questions. It is possible that some of them, or some very like them, may again become so; but in this case it is unnecessary to give thought to them. They are here because, and only because, plaintiff based his Philadelphia suit upon the answers he says he thought should be given to them. It is to be remembered he is not now seeking to prevent a strike, or to recover for damage done by one. He was not expelled because he refused to join in one.

The law is not such an exact science that either the legal or the moral right of the plaintiff or of any one else to institute legal proceedings is conclusively determined by the result of the litigation, or the judgment of the court upon the issues of law or of fact raised by him. Legal process may be abused. Litigation may be begun by one who does not believe in his case, and who does not expect to win it, but has some ulterior and perhaps sinister purpose to serve by it. Oftentimes it may not be either easy or expedient to punish him for so doing, but that he deserves punishment is clear enough, not because he lost his case, but because he always knew that he should never have brought it. The mere fact that he was unsuccessful does not prove, and has, as men are, very little tendency to prove, that he was dishonest in bringing it. It is true that some contentions may be so clearly frivolous on their face that it is hard to understand how any one could believe in them. Their very nature raises a presumption of bad faith, albeit rarely a conclusive one. Men, ordinarily fair and reasonable, under the pressure of interest or of prejudice are ready enough intensely to believe in propositions which to outsiders seem indefensible or absurd. It is impossible to say that any of the contentions made by the plaintiff in his Philadelphia bill are so patently bad as in themselves to suggest they were set up in bad faith. Farther than is necessary to reach this conclusion, it is unnecessary to go into any of them.

[8] The charge upon which plaintiff was expelled was that in bringing the Philadelphia suit he had violated section 35 of the Standing Rules of the Brotherhood, which imposes the penalty of expulsion upon any member who, by verbal or written communication to railroad officials or others, interferes with a grievance that is in the hands of a committee, or at any other time makes any suggestion to any official that may cause discord in any Division. There is here no mention of legal proceedings. The place in which this section appears among the rules does not suggest that it had reference to them. The language employed does not give the impression that the framer of it had them in mind. An intention to deny all access to the courts of the land will not be presumed. If it be enforceable at all, it must be unmistakably expressed.

[9] At the hearing something was said as to section 54 of the rules. That does prohibit resort to the courts in any controversy aris-

ing within the organization, and for which the laws of the Brotherhood provide a means of settlement, without having previously exhausted all remedies within the Brotherhood. Nothing which plaintiff is charged with having done offends against this rule. The Grand Chief ordered a strike to begin in a few days. The only possible appeal within the order was to the next triennial convention, which would not meet for 14 months. Plaintiff says he believed that in giving such an order the Grand Chief was doing something that under the laws of the Brotherhood he had no right to do. Under the circumstances, there was nothing the plaintiff could do within the order, and there would have been nothing he could do, had he been absolutely right in his contention that the authority given 9 months before was at an end. The rule by the clearest implication sanctions a resort to the courts when a remedy within the Brotherhood does not exist.

[10] The learned and zealous counsel for the defendants at the hearing frankly conceded that one of the recognized limitations upon the very broad powers of discipline over their members, possessed, by voluntary unincorporated societies, is that they may not be exercised to punish one for seeking aid of the courts where the machinery of the organization cannot give it. Yet the only charge upon which the plaintiff was put upon trial was that he had gone into court. This, of course, is admitted. The charge was in writing and speaks for itself.

This would end the case, were it not that the defendants contend that plaintiff was expelled, not for suing, but because he sued at the instance, under the direction, and at the expense of one of the railroads, the opposing parties to the controversy in which the Brotherhood was engaged. There is no charge that in what was done there was aught of champerty or of maintenance. The complaint is not that the railroad, with the assistance of the plaintiff, was interfering in something which did not concern it, but that it, on the other hand, was vitally interested on a side of it upon which plaintiff, had he been a loyal member of the Brotherhood, would not have been found.

Instinctively most men will feel that the plaintiff, by acting as he did in close co-operation with the railroad, put himself in a position in which they would rather not be. It is all well enough to say that—

"Plaintiff believed in his case. He wanted to prevent the strike, and his grounds for so wishing were, as they presented themselves to his mind, worthy. He was a poor man, or at all events a man of very moderate means. There is nothing to suggest that he had had any experience in litigation, or any knowledge of the best way of acting in such a matter with the speed necessary to any prospect of success. That in whatever other respects he and the railroads may have differed, they were at one in fearing and disliking the proposed strike, and that from their respective standpoints they had good reason to do so. Under such circumstances, what harm was there in their acting together to attain an end which both honestly believed good?"

It might not be easy to point out the flaws in this chain of reasoning, and it is not intended to attempt to do so, other than to call attention to the fact that the demand for an eight-hour day and the accompanying extra pay for overtime was in itself something of which all the members of the Brotherhood, including the plaintiff, approved.

He differed with the officers of the Brotherhood and with the large majority of his fellow members, in that he was opposed to the radical measure by which they sought to attain speedily the common wish. He would doubtless have made them angry if, at his own initiative and at his own expense, he had sought by the aid of the courts to block their purpose. Indeed, when they expelled him, it does not appear that they knew he had not, although it may be taken for granted that they did not believe he had. Now that it is clear that the suspicions which they doubtless always had were well founded, and that the suit was brought at the request of the railroad company in the way its legal advisers had planned, and at its expense, though in his name, it will not be surprising if they feel that he is a traitor to the Brotherhood, and that in time of open war he went over to their adversary.

It is not intended here to intimate any opinion as to whether such a feeling would be justified or not. There can be no question that it would exist. As the record here stands, it is not necessary, and would be perhaps improper, to intimate any opinion as to whether the Division would have been justified in expelling him, had he been charged with acting in co-operation with the railroad to prevent or obstruct the strike, and thus having entered into relations inconsistent with his membership in the Brotherhood, for no such charge was made against him, and he was given no opportunity to present any defense he had to it. All of which he was accused was the bringing of the suit. If that was sufficient ground for expulsion, there could be no defense because the fact was so; but if the gravamen of his offense was his co-operation with the railroad, he should have been told so, in order that he might have made such explanation as he could. No technical precision can be expected or is required in the proceedings of such associations; but they cannot charge a member with something for which in law they may not punish, try him for that of which they have accused him, and then justify themselves for expelling him by showing that he was guilty of something which they did not allege against him. The rules of the Brotherhood themselves require that the charges upon which a member is brought to trial shall be in writing.

It follows that the plaintiff is entitled to the relief for which he asks. No opinion is intimated as to whether it will still be open to the Division to consider and act upon a new charge or charges raising the question of the plaintiff's relations with the officials of the Pennsylvania Railroad at the time and under the circumstances existing prior to March 19, 1917.

The plaintiff, upon due notice to the counsel for the defendants, may present a draft decree.