BURKE v. MONUMENTAL DIVISION, NO. 52, BROTHERHOOD OF LOCO-MOTIVE ENGINEERS, et al.

(District Court, D. Maryland. December 29, 1922.)

No. 256.

1. Trade unions ⊂⇒4—Right of labor association to expel members.

A voluntary labor association, in a large measure, has the right to fix its own qualifications for membership and to expel members who do not live up to them, and where the question of admission or expulsion affects the right of membership alone and does not incidentally involve other rights, such right is independent of legal control.

2. Trade unions ⊂⇒4—Court held not authorized to enjoin expulsion of member of labor organization.

The fact that expulsion of a member of a labor organization would automatically deprive him of the right to maintain his insurance in a separate organization which limits its risks to persons who are, and remain, members of the Brotherhood, *held* not sufficient to authorize a court to interfere by injunction.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by D. J. Burke against Monumental Division, No. 52, Brotherhood of Locomotive Engineers, and others. Decree for defendants.

F. Howard Smith, of Baltimore, Md., and Cyrus G. Derr, of Reading, Pa., for plaintiff.

Arthur L. Jackson, of Baltimore, Md., for defendants.

ROSE, District Judge. This case is a sequel to that between the same parties, the opinion in which has been already reported (273 Fed. 707). To it reference may be had for a statement of the facts up to the time it was handed down. The decree passed in accordance with it was not appealed from, and what was there actually adjudged is binding upon the parties.

On November 9, 1919, not long after it was entered, a third charge was preferred against the plaintiff to the division of which he was a member. It was based upon the same transaction as the preceding two, except that it alleged that he had betrayed the interests of the Brotherhood by aiding the railroad and negotiating with it at a time when the Brotherhood and the railroad were having a labor dispute, and at the request of the latter, permitted a suit to be filed in his name in the District Court of the United States seeking to restrain the members of the Brotherhood from calling a strike, and that his conduct at that time was in violation of the obligation assumed by him upon entering the Brotherhood, and of the duty and obligation owing by him as a member to the Brotherhood. A copy of the charge was served upon him, and he was notified of the time and place at which his division would sit to hear what he had to say. At that time he put in a written statement in which he set forth his position, substantially as he had in his testimony in court in the former case. He again denied the jurisdiction of the division under the circumstances to sit in judgment upon him, and for that reason refused to answer the various questions which members of the division put to him. He was found guilty and sentenced to expulsion. He appealed to the Grand Chief, and, from his adverse decision, to the Grand International Division, but unavailingly, as the action of the division in expelling him was confirmed. He then filed the bill in the instant case.

The defendants moved to dismiss on the ground that his remedy, if he had any, was at law, and not in equity. In the former case that contention was held unsound. The plaintiff says he has once been tried, for the same act now charged against him, and may not, because of it, be put a second time in jeopardy. His first conviction was set aside at his instance, because the accusation then preferred was not sufficient to put him upon his defense. There is nothing in the Brotherhood's rules prohibiting retrials, and there are systems of jurisprudence which sanction them. The prohibition of them rests upon high expediency rather than upon any requirement of abstract justice. At all events, under the circumstances of this case, the court would not be justified in holding that the plaintiff could not be retried.

The real question for decision is whether he may be expelled for permitting the Pennsylvania Railroad Company to institute, in his name

and at its cost, legal proceedings which it has been judicially determined he had the right to bring if he had done so of his own motion, and without the assistance of the railroad corporation. He was at one with the overwhelming majority of his fellow members in wanting the basic eight-hour day. He differed with them in that he believed it was unwise to strike for it. In March, 1917, he was convinced that the authority to call a strike, voted the officers of the Brotherhood in the preceding summer, was no longer in force. Nine months had gone by since the ballot had been taken. It was more than six months since a strike had been ordered under the power originally given, and since it had been called off in consequence of the passage of the Adamson Act. It was nevertheless true that it had been voted as a means of securing a basic eight-hour day, and that had not yet been obtained, nor could any one say, with certainty, that without further action on the part of the Brotherhood it ever would be. It was quite possible that the Supreme Court might hold the Adamson Act unconstitutional, as four of the nine justices thought it was. If their view had prevailed, there would have been in March, 1917, as much occasion to put economic pressure upon the railroad companies as there had been in the preceding summer.

It is easy to understand how the Brotherhood chiefs may still have thought themselves authorized to call a strike. Yet there was a good deal to be said on the other side. Much had happened in the intervening nine months, not the least being that on February 3d we had broken off diplomatic relations with Germany. The chances were that in a few weeks at the most we would be actively engaged in the greatest war of all time. Was it certain that, under such circumstances, the rank and file of the Brotherhood would have been willing to have made their country helpless in the very hour of its direst peril? Ardently as they longed for a basic eight-hour day, and convinced of its essential justice, as they doubtless were, was it not quite possible that at such a time they would have been willing to put the safety of their country first? The patriotic response that so many of them made to every war call argues strongly that they would have done so. At all events, one, like the plaintiff, who, even in the summer of 1916, had believed a strike inexpedient, might feel that under the altered circumstances the majority of his fellow members had come around to his point of view.

The defendants have a good deal to say about his long and earnest advocacy of the basic eight-hour day. It is not perceived that this fact tends to convict him of insincerity. The more convinced he was of its justice and its reasonableness, the readier he may well have been to seek it from the award of some impartial tribunal rather than attempt to secure it by the use of the dangerous and costly weapon of a strike. On the other hand, the officers of the Brotherhood had for various reasons come to distrust arbitration, and wanted none of it. They were by no means sure that any arbiters likely to be chosen would give them what they wanted, and they believed that a strike, or perhaps merely the threat of it, would. The situation in which the country was gave them an enormous strategic advantage, if they chose to avail

themselves of it, and in a few weeks it might be lost to them. If they waited to act until war was actually declared, public opinion might make an effective strike impossible. Then, as Mr. Stone testified in the former case, they feared Congress might forbid one altogether. In all probability they thought the call of it would be all that was needed, and so it proved. Nevertheless, even from the Brotherhood's standpoint, there was at the time much to support the plaintiff's point of view. If, with the nation in the danger in which it then was, a strike had paralyzed its means of transportation, the unions might have aroused against themselves a storm of public indignation intense enough to shatter their power for years to come. The plaintiff might well have thought, as he says he did, that his highest duty to the Brotherhood, as well as to his country, required him to do everything he could to prevent so dangerous a conflict.

There is no occasion here to say which was right, or the nearer right, if indeed such an issue in its broader aspects can ever be one for judicial determination. It is enough that the most loyal and devoted members of the Brotherhood, and the most earnest believers in the basic eight-hour day might well have thought that in March, 1917, a railroad strike was something which should be prevented. Even so, was the plaintiff justified in attempting, at the instance and with the help of the Pennsylvania Railroad, to stop it by invoking judicial interference?

The Brotherhood exists that, through it, its members may bargain collectively with the railroads. To do so effectively, it must settle its internal differences within its own organization, and in its negotiations with the roads, speak and act as a unit. It is true that its officers may usurp powers not theirs, and if they do, when no appeal can be made to the Brotherhood itself, any of its members may seek the aid of the courts, but that does not necessarily mean that they may lend their names to the railroads with a view of defeating or obstructing the policy which the official heads of their organization are supporting. Naturally and properly, those who belong to it take it seriously. In the answer in this case, the plaintiff's conduct is characterized as "traitorous," and it is said that he has committed "moral perjury." This is strong language; but there is no reason to question that it is really meant, and that those responsible for its use believe it to be fully justified. The truth doubtless is that to them the Brotherhood and the roads appear to be almost distinct sovereignties. At a time when it is at grip with the companies, for a member to let one of the latter sue in his name, for the purpose of preventing the use by it of one of its most efficient means of warfare, does to them seem treasonable. Within the limits of their power, they are determined to punish any such proceeding. They feel about it as did Congress when in 1799 it enacted the so-called Logan Act, now embodied in section 5 of the Criminal Code (Comp. St. § 10169), making it a crime for any citizen to have intercourse with a foreign government with intent to defeat the measures of his own. One charged with the offense would not be heard to say that he, in common with a majority of all the citizens, believed that what the government of the day was trying to do would be highly prejudicial to the true interests of the United States, or even that the

de facto government of the country was not such of right as during the term of one President, many persons actually thought was the case. It may be that under the peculiar, and from some points of view, extreme, circumstances of this case, plaintiff might have been justified in conferring with the railroad company, or anybody else interested in preventing the strike, and in openly co-operating with it to that end, but what he in fact did was more open to criticism.

[1] It is not suggested in the view of the courts, that any voluntary association can be sovereign, no matter whatever its nature or purpose, whether it be economic, social, political, or religious. All history and experience teaches how ready members of such an organization are to assume that it sometimes is, and to substitute its collective conscience and judgment for their own, and how dangerous the consequences may be. For these reasons, in the modern world, all are alike subject to the law of the land. Nevertheless, in a measure, and in a large measure at that, they have the absolute right to fix their own qualifications for membership, and if they will, to expel all who do not live up to them. A religious sect may, if it chooses, forbid its members to do something which to all the rest of the world seems harmless, or perhaps even praiseworthy, and if they persist in violating its command, it doubtless has the right to turn them out. Bouldin v. Alexander, 15 Wall. 131–139, 21 L. Ed. 69; Nance v. Busby, 91 Tenn. 303, 18 S. W. 874, 15 L. R. A. 801. Some of the considerations which forbid the courts to meddle with the internal discipline of religious societies are not applicable to purely secular associations, but so far as concerns the power of admission and expulsion, the latter are also to a large extent independent of legal control, where nothing but the right to be or to remain a member is involved.

It is quite easy to understand, and to a degree at least to sympathize with, the attitude of the Brotherhood towards the plaintiff, no matter what may be one's personal opinion of the moral right to strike at the time and under the circumstances. If no more were at stake than the plaintiff's right to continue membership in an organization, that did not want him, and he had had a fair hearing according to its rules and practices, presumably there would be no ground for interference by the courts. In all such cases, the difficulty of deciding arises when it is apparent that the expelled member is deprived not only of the right to associate with people who would have none of him, but that the effect of the expulsion is to inflict upon him other more substantial penalties. To return to an illustration already used, any church may excommunicate any of its members, as freely to-day as it could have done some seven centuries ago. On the other hand, the courts would doubtless interfere for his protection, if there was any attempt to enforce against him the serious secular penalties and boycotts which in medieval theory, if not always in practice, were to be visited upon him who was under the major excommunication. In a trade in which no one but a member of a union could obtain employment, expulsion from it might be equivalent to a deprivation of any opportunity to earn a livelihood in the only way in which the sufferer might be qualified to do so. There is no such state of things in the instant case, and no

opinion as to what effect, if any, its existence would have is here suggested, for as stated in the former opinion, the Brotherhood never has made any objection to the employment of nonunion men, and the plaintiff has gone on with his work since his expulsion precisely as he would have done had he still been in good and regular standing.

[2] What plaintiff has lost other than the privilege of belonging to an order which does not like him, and for many of whose members he has little use, is certain insurance of the value of upwards of $3,000. It is true that no direct sentence of forfeiture of it has been passed upon him, but as it is in a corporation in which no one but a member of the union can become or remain insured, his expulsion from the latter automatically takes it from him.

If he has done everything of which he has been adjudged guilty, nevertheless he has broken no law of the land, and he insists that the Brotherhood has no right to impose upon him so material a loss of property rights merely because it disapproves, however strongly, of what he did. To say that when he joined the Brotherhood, and when he paid the various assessments which have built up for him the valuable property right he has, he agreed to be bound by its rules and to forfeit its insurance if it expelled him, after a fair hearing in the way prescribed in its laws, is perhaps not a conclusive answer to his contention, for there are doubtless rights which are so far inalienable that no one can in advance give another the power to take them from him. There is, however, nothing unreasonable in the arrangement by which a particular insurance company may limit its risks to those who are and continue to be members of a particular society, nor in any regulations by which a society may, within certain broad limits, determine for itself who may remain a member of it. The cases of expulsion from organizations which insure their members are many. It is, of course, possible to conceive of a condition of things in which from the very extent of benefits resulting from membership, the power of expulsion would give it a control over its members, dangerous to the public weal. It is sufficient here to say that nothing in this record shows such a situation, even if it be assumed that in the absence of legislation, the courts would be competent to deal with it if it were really present.

With a full appreciation of the importance of the issues raised, and with some understanding of how the plaintiff may well have supposed himself justified in doing what the Brotherhood charges against him, I cannot, on the whole, see that in expelling him it exceeded its rights. Bearing in mind its essential objects and purposes, it would seem that what he did came within the second of the class of offenses for which Lord Mansfield thought a corporator might be discharged, namely: "Such as are against his oath and duty of his office as a corporator, and amount to a breach of the tacit condition annexed to his franchise or office." Rex v. Richardson, 1 Burr. 517, 538. If there is any public danger from the possession and exercise of such powers by voluntary associations, the remedy must be sought from the Legislature.

The plaintiff in his bill charges that the strike was forbidden by various statutes then in force. Into that question it does not seem neces-

sary to go for the essence of the plaintiff's offending was not that he filed his bill, but that he did so at the procurement and at the expense of the Pennsylvania Railroad Company, and did not disclose that fact on the face of his complaint.

This opinion has been drawn out to perhaps undue length in an attempt to guard against it being understood to decide anything except that which it expressly passes upon. From what has been said, the plaintiff's bill must be dismissed.