Roy J. **UNDERWOOD**

v.

William E. **MALONEY**, individually and as representative of the International Union of Operating Engineers.

Homer **DAWSON**, et al.

v.

William E. **MALONEY** and Hunter P. Wharton, individually and as representatives of and on behalf of the International Union of Operating Engineers.

Civ. A. Nos. 14398, 14547.

United States District Court
E. D. Pennsylvania.

May 23, 1957.

See also 16 F.R.D. 3.

Freedman, Landy & Lorry, by Abraham E. Freedman, Philadelphia, Pa., for plaintiffs.

Montgomery, McCracken, Walker & Rhoads, by Charles A. Wolfe, Myers, McVeigh, Mansfield & O'Brien, by Cornelius C. O'Brien, Jr., Philadelphia, Pa., for defendants.

William H. Thomas, Cleveland, Ohio, Gen. Counsel Emeritus, International Union of Operating Engineers.

CLARY, District Judge.

We have for decision two actions; the case of Roy J. Underwood against William E. Maloney, Civil Action No. 14398, and the case of Homer Dawson and 11 others against William E. Maloney and Hunter P. Wharton, being Civil Action No. 14547.

In the Underwood case, Underwood seeks to enjoin the enforcement of the decision of the General Executive Board of the International Union of Operating Engineers suspending him and to reverse such action. He seeks restoration to his position as President and Business Manager of Local 542 and its branches, 542A, 542B, and 542C of the said International Operating Union, to restrain Maloney, the General President, and the General Executive Board from interference with the performance of his duty

as President and Business Manager, and further seeks damages in a total sum of $250,000.

The Dawson case purports to be a class action, Dawson and his colleagues seek to set aside and nullify the order of supervision invoked by the General President on August 19 of 1952. They seek reinstatement of all the officers of Local 542 and to restore control of the Local to its own membership, return of all funds, records and assets, and an accounting from the defendant Maloney and from Wharton, who has been installed by Maloney as Supervisor of the Local and its branches.

The Court will now proceed to outline the facts adduced in this record which it deems pertinent to a decision of the legal issues which have to be this day decided.

For purposes of clarity I propose to outline the facts in a series of periods, the first period ranging from 1938 to 1948, the second period running from March 31 of 1948 to May 1 of 1952, the third period from May 1, 1952, to September 27 of 1952, and the fourth and final period from September of 1952 to the present time.

Despite the objection of the defendants to the testimony antedating 1948, I feel that for a full understanding of the issues involved in the case, the evidence which was introduced of the Union and its activities during this ten-year period is entirely relevant to a decision of these issues. I shall take that period because, as I recollect the evidence, Mr. Underwood joined the Local in or about the year 1937. The charter of the Local had been granted in 1935. As of the date of Mr. Underwood's first connection with the Union as a member, the Union was under supervision of one Joe Fay, a member of the New Jersey Local. Maloney was not the President at that time. I believe the President at that time was one Huddell. The evidence has

disclosed to my satisfaction that the method of operation of Local 542 was anything but good. At that time every worker was compelled to pay to the Union a percentage of his total salary earned during any given week. That was in addition to the dues.

In judging this case I am not losing sight of the real facts of the economic history of the United States. Unions, particularly on the international scheme, from the mid thirties, after the Wagner Act, 29 U.S.C.A. § 201 et seq., were developing rapidly. It is not at all surprising that there should be some difficulties and differences in the course of expanding and growing organizations. However, the Local Union never had a chance to conduct its own affairs. The evidence discloses that up until 1940 there was turmoil in the meetings of the organization and there was this situation, which I definitely deplore, of forcing the members to pay percentage assessments.

That situation, however, was cleared up shortly after Maloney, the defendant in the Underwood case, became the General President.[1] As far as my review of the evidence is concerned, it appeared to be shortly after Maloney was made the International President.

However, Maloney did appoint one Jasper White—and it does not appear in the record on whose suggestion—as Assistant Supervisor,[2] Joe Fay having been Supervisor at the time Maloney came to office as International President. The actions of White as Supervisor were anything but helpful to the labor movement. I think the evidence clearly discloses that from 1940 to 1947 Joe Fay had little if anything to do with the running of the Local, appearing only occasionally. There is no doubt that the record clearly discloses that White negotiated all contracts during that period.

At that time one William Carter also appeared in the picture from New Jersey, and the evidence discloses that, repre-

1. R. 743, 744.
2. Note, however, that it was Maloney who sent John McDonald into Philadelphia as his representative to investigate White's activities, R. 1884, 1885; such action was very much resented by White. R. 510.

senting Fay, he, Carter, signed contracts with contractors, collective bargaining agreements, for Local 542, which were the contracts under which the Local worked. I shall have quite a bit more to say about Mr. Carter later in the discussion. I merely point up the fact that that happened during that period.

In 1945 Underwood attempted to secure what I choose to call local independence. There has been used through this case "local autonomy," which I find does not appear anywhere in the picture. "Autonomy" can mean a lot of things, and I don't propose to use "local autonomy" as the basis for a decision or have that word involved in a decision in this case. I prefer to use the term "local independence."

It is extremely significant of White's hold on the Union, his intimidation of members, and so forth, that it took approximately two years to secure enough people to start a lawsuit. However, such a lawsuit was started in the Court of Common Pleas No. 2 of Philadelphia County, the purpose of the suit being to restore independence of operation to the Local Union. After a second review of the evidence in this case I am pointing up at this time that the defendant in the Underwood action and in the Dawson action in this case, when the case came up for trial, immediately agreed, without the necessity of the trial, to have the membership decide for itself (1) whether it wanted independence of operation, and (2) if the vote was in the affirmative, to have an independent election of officers. The vote was had, strongly in favor of independence, and an election of officers was had.

I should note at this time that Fay, having been convicted of extortion in the New York area, which conviction was affirmed by the Supreme Court of the United States in 1947, Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043, had been replaced by Third General Vice-President McDonald as Local Supervisor, and that Fay had been immediately after his conviction peremptorily expelled by Maloney from the Union of Operating Engineers.

It is apparent that McDonald and Maloney were at that time perfectly willing to have Local 542 obtain its own independence of operation and function as an independent integral part of the International Union of Operating Engineers.

We now come to the period of April 1, 1948, to May 1, 1952. In that period there was a remarkable improvement in the method of conducting the meetings and in the approach of the officers and business agent and the Executive Committee to Union obligations. I recognize and I think the evidence clearly discloses that this did not happen without some bickering and quite a bit of turmoil. I think the evidence also establishes that it was McDonald's suggestion to Underwood and the membership that a system of fines of $5 to $25 be imposed on anyone who interrupted meetings, which seems to the Court to be a sensible and practical solution. At any rate, as a result of the putting on of the penalties, the turmoil and bickering soon calmed down, and during Underwood's term of office—and I am limiting it to the period up until July of 1952—any member who desired to talk upon a subject on the floor was fully protected in his right of free speech and free expression at that time. I say that even though such a person might have ideas which were contrary to that of the President and General Manager and the thinking and decisions of the Executive Board of Local 542. I shall not advert to that particular subject again.

In the situation where Underwood and his elected group of officers obtained their independence as of March 31, 1948, they were faced with a problem of negotiating contracts which expired on April 30 of that year. That it was a difficult situation is perfectly understandable, and that there was some trouble at that time, in view of my previous statement, is also completely understandable. I do not think that

it is necessary for a decision in this case—except for one element to which I shall refer later in the opinion—to talk about the contract negotiations of 1948 and 1949. That was the period of the Feinsinger arbitration, and it was not until October of 1949 that the final decision was made. It resulted in a reasonable settlement of difference between the contractors and Local 542.

There is, however, one point that I want to make at this time, that within two months after Underwood became President there was a short strike, that Underwood was in a large measure a proponent of that strike, even though it was called in violation of International contracts and even though it was called in violation of the master agreements with the Building and Construction Trades Council, of which Local 542 was a member.[3] It was a very short strike, but it indicates on the part of Underwood and his associates the beginning of an attitude which will become rather important as we develop the facts in the discussion of a final decision in this case.

Working under the 1949 agreement from 1948 up until 1950, it appears that, with the help of Vice-President McDonald, the operation of 542 was as nearly perfect as the Court can conceive is humanly possible.

The collective bargaining agreements had been, by custom and practice, for one-year periods. The effective dates were from May 1 of one year to April 30 of the next year. True it was that the actual signing of the contracts were often subsequent to the May 1 date, but the provisions of the contracts were retroactive to that date. My recollection is that even in the Feinsinger arbitration that condition also prevailed.

We are now at the beginning of the crucial periods in this case, 1950 to 1952. The unions and the Philadelphia local contractors orally agreed to the installation of a welfare fund, and at this time I intend to give certain definitions which will carry through the rest of this opinion. Hereafter when I mention the local contractor associations, I shall refer only to the three local Philadelphia associations, which comprise roughly in the neighborhood of 100 contractors, actually 98 contractors.

As opposed to that, there were several times that number of contractors in and beyond the five-county area covered by the three associations of which I spoke. Included in that group of contractors were contractors who were also members of associations such as Lehigh Valley, and so forth, numbering many times the number of members of the local contractors associations. Those contractors will hereinafter be referred to by me as the independents.

After the negotiations between the Union and the local contractor associations for the collective bargaining agreement for the year 1950 to 1951, the Union designated one Robert G. Kelly, its attorney, to conduct negotiations and to settle details of the collective bargaining agreement, as well as the setting up and operation of the welfare fund. It took many weeks to accomplish that result, and that Kelly did his job well is evidenced by the fact that his efforts met the unanimous approval of the Union. That was the case where one Halloran was the sole negotiator for the local contractor associations and Kelly for the Union.

However, there did come a time when the question of the deductibility of the employer's 10 cents an hour per employee as a business expense came into question. The welfare agreement was scheduled for two years. The collective bargaining agreement was scheduled for one year.

3. R. 580–587; D–6, D–7; though the wage scale under such contracts may be less than the prevailing wage in some sections of the country they are substantially in excess of the prevailing wage in the industry in other sections. Clearly the General President has the power to enter into such agreements and the local apparently lost sight of the fact that a General President has a duty to look out for the welfare of all the members and not simply the members in the Philadelphia area. R. 1966–1969.

In that situation Halloran and Kelly conferred, Halloran pointing up the apparent or real difficulty which the members of the contractor associations faced, and Kelly still in good faith feeling that he had the right to represent the Union.

As a result of that conference Kelly signed an addendum, as the Union representative, making the terms of the collective bargaining agreement the same as the welfare agreement and extending its terms to April 30 of 1952. That addendum, the evidence disclosed, did not come to Underwood's attention for a matter of weeks, and he attempted in the fall of 1950 to repudiate the agreement. I believe it was a matter from August to October. I do not believe it important for decision in this case whether the contractors did or did not take any action at that time. At any rate, we can take this as the fact, that from that moment on the local association contractors took the position that they had a valid two-year agreement. The Local Union and its negotiating committee, through Underwood, declared that Kelly had no authority to make that addendum extending the provision one year. They repudiated it and asked for negotiations with the local contractor associations for a revision of the benefits under the agreement.

It was at this time that the differential between the independents and the local contractor associations became very important. The Union, through Underwood and his associates, obtained an agreement with the independents, who, as I have said, were many times in number greater than the local contractor associations, to advance from May 1 of 1951 to April 30, 1952, the base rate of pay 25 cents an hour. The local contractors, asserting that they had a valid subsisting contract, refused to bargain in that connection, and the Union declared a strike. The local contractor associations went to court, and in a lower court action, affirmed about the middle of March of 1952 by the Supreme Court of Pennsylvania,[4] it was decided that there was a valid subsisting collective bargaining agreement and that the Union was bound to honor its contract under the law.

That was the posture of the situation in March of 1952, at a time when there was no question in fact or in law that the collective bargaining agreement of Local 542 with the local contractor associations expired on April 30 of 1952. Notice to that effect was timely given by the Union, and the local association contractors were invited to negotiate a new agreement. It is clear from the testimony that very little effort was expended by Local 542 in sitting down and negotiating affairs with the local contractor associations.

Sharply contrasted to this, however, is the approach of Local 542 to the independent contractors. Negotiations were entered into with the independents, vigorously pursued, and a result of a basic change in rate of pay of an additional 15 cents was secured, which totalled, as of May 1, 1952, a differential of 40 cents between the amount of the local contractors' agreement of 1950 and the new agreement with the independents. The agreement, so far as the Court has been able to determine from the testimony submitted in this case, was an entirely reasonable and practical bargaining contract.

We now come to the third period, the period from May to September of 1952. Factually we know that there was no contract with the local contractor associations as of May 1, 1952. Under proper procedures the Union struck the jobs of the contractors belonging to the local associations.

What was the position of the Union? The Union was in a very pleasant economic position. At that time the United States Steel Company was building the Fairless Steel Works near Morrisville,

4. General Building Contractors' Ass'n v. Local Union No. 542, 1952, 370 Pa. 73, 87 A.2d 250, 32 A.L.R.2d 822.

Pennsylvania. There was plenty of work on that job to take up any slack. It is clear that Local 542 did not have enough pickets to picket the jobs of the local association contractors. It was necessary for them to hire pickets from a maritime union, and to be even partially effective it was necessary for them to pay extra money to their men to do picketing.

Was there any effort to settle this strike? That is the crux of this case. In the agreement with the independents there was what I choose to call an open-end item, that should the Union be able to secure from the local associations terms which were superior to those contained in the independent contract or obtain greater benefits for the members of the Union, the independents would retroactively agree to the same advantages being included in their contract with the Union.

What were the demands or suggestions made by the Union to the local contractor associations?[5] First of all, I think it is clear from the evidence that there was demanded every single item of benefit to the Union contained in the contract with the independents, including a 40-cent rise over the 1950 contract, but those demands were coupled with the absolute requirement that the local contractors pay every operating engineer who worked for any of them during the period from May 1, 1951, to April 30, 1952, retroactively 25 cents an hour, which was the amount paid by the independents, and which was what Underwood and his negotiating group for the Union wanted in 1951 but which the court said, under a valid subsisting contract, the men were not entitled to.

In other words, Underwood demanded the dollar value of the fruits of the contractors' victory or affirmance of the validity of the contract in the spring of the year. Although the contractors won in their contentions that they had a valid contract at which the Union had agreed to work for a period of one year,

nevertheless, that was the one thing that had to be determined first in this negotiation.

If that were all, it might appear that a decision on that might not be insoluble, but what else did the Union demand? It demanded a pension plan not demanded of the independents. It demanded a safety code not demanded of the independents, with a penalty of $500 to be paid into such fund as the Union might direct. Violation of the safety code works both ways. An employer might violate it and an employee might deliberately violate it. That employee would be a Union member, but nevertheless, under the proposed agreement, the contractor would be responsible for the deliberate acts of the Union member.

Not required of the independents was a provision that if a machine were on a job belonging to any person or contractor with whom the Union had any dispute, it could not be operated, and if necessary for operation on the particular job, the whole job might be shut down.[6] Furthermore, they demanded that for any infraction or violation of any provision of the entire agreement, the employer must pay $500 into some fund to be designated by the Union, and that collectively every employer would be responsible for the acts of the individual members of the Association, a matter of joint or several liability on independent unrelated acts, and, further, that the Union would have the right to, in effect, exercise a veto power on who should be further members of any particular association.

It has been testified to, I believe, or argument has been made and it hasn't been controverted, at least as to the last four or five items, that this type of demand has never been heard of in the history of collective bargaining in the United States.

In the Union's very favorable strategic economic condition, the Court has gathered from the testimony a very firm con-

viction that Underwood did not make a serious attempt to discuss a reasonable contract with the local contractors.

What was the condition of the persons affected, the local contractors in that situation, since their activities have been involved in large measure in this case? I am starting out by saying that there was one attempted action on the part of the local contractors which I utterly and vehemently condemn. Chief negotiator for the local contractors, Halloran, was definitely in a difficult situation, and in that situation he undertook to break the Union. He called on one Baronett, a former business agent, and another character of less than renown, Bozzelli, and attempted to have them organize a back-to-work movement, or if that should fail, to obtain from the general officers, the officers of the International Union, a new and competing charter in competition with Local 542. That he had no right to do anything of that nature, since he was a contractor and an employer, goes without saying, and the fact that he spent many thousands of dollars in trying to bring about this unwholesome and unholy result is certainly nothing to his credit, but, fortunately, he failed.

I shall now recount in chronological order the facts only, without comment, of the months of May, June, July, August, and September which I deem have a bearing upon the ultimate decision in the case. What was the position of the contractor associations and what did they do? I have discussed and will not refer again to the unwholesome attempt at union breaking.

The Local attorney for the Philadelphia contractor associations associated with him former Attorney General McGrath. Mr. McGrath, through George Meany, then Secretary-Treasurer of the A. F. of L. and now the President of the A. F. of L.-C. I. O., brought about a meeting between Halloran and Maloney in Chicago. This meeting was had only after McGrath had intervened

with the then Secretary of Labor of the United States, Maurice Tobin, to use his good offices to settle the matter. Tobin sent someone to Philadelphia who brought back what was apparently a favorable report that the matter might be discussed calmly and an honorable settlement reached. Halloran also enlisted the services of William E. Carter, heretofore referred to, then an official of the New Jersey Local, and requested him to bring the contractors' position to the attention of International President Maloney.

Underwood was summoned to a conference at the Hamilton Hotel in Washington with Maloney, at which certain discussions took place which I will hereinafter refer to. In addition, Maloney asked Carter to make an independent survey and report. Maloney further summoned Underwood to Chicago, and in a three-day or four-day meeting there was later brought into the picture first Carter and secondly Halloran. The details of that meeting will be later referred to.

Underwood returned to Philadelphia, and the local unit of the Building and Construction Trades Council began to enter into the picture and importuned Maloney to do something about the settlement of the strike. Meetings were held by Underwood with the negotiating committee of the contractors, with the negotiators for the Union, with Carter sitting in, and they were entirely fruitless. On August 4 there was a meeting of the Executive Committee of Local 542, at which time it was clearly evident that there might be some intervention on the part of the National President, and by unanimous vote of the Executive Committee, confirmed apparently unanimously at a meeting of the membership on the 5th, it was decided that the Local Union would maintain its position and, if necessary, refuse to obey any order of the International President in connection with the then strike which had started on

May 1,[7] and we are now up to August 5.

In the meantime there was a meeting of the A. F. of L. in Atlantic City, attended by Maloney. He had been importuned up to that point in some degree by the Secretary of Labor of the United States. Mr. Meany and Attorney General McGrath had talked to him. The high officials of the Building and Construction Trades Council had pressured him, claiming that there were 8,500 people walking the streets out of work because of the action of the Operating Engineers. He had received a rather startling telegram from the then Governor of Pennsylvania pointing out clearly that the action of the Engineers had stopped—and there was no denial of this—public construction in the amount of $125,000,000, which included highways, bridges, hospitals, schools, which the Governor deemed important for the welfare of Pennsylvania;[8] and in that status he issued an order for Underwood to order the members of Local 542 back to work and within 24 hours to notify him of his intention to comply.

What happened? In defiance of the order Civil Action No. 14071 was instituted in this court, charging a criminal conspiracy between Maloney, the officers of the Local Building Trades Council, Attorney General McGrath, Halloran, and there may have been some other people involved. The plain implication was that Mr. Maloney was being paid for what he did, in other words, that he had been bribed, and that assistance in the bribing came from the former Attorney General of the United States. I will have a lot to say about that later.

The case came on for hearing before Judge Grim of this court on the 14th day of August, 1952, and after two days of hearing, conducted mostly in chambers in the form of informal discussions, the case was settled by agreement, and it was decided that there would be a recommendation that the men return to work, waiving, as a condition of arbitration of any difference, the 25 cents an hour differential between the independents and the local contractors for the year May 1, 1951, to April 30, 1952.

That agreement was approved by the Union, and the men returned to work, and on that very day the order of supervision here under attack and consideration was issued by General President Maloney, and control of Local 542 passed to the supervisor appointed by the President, Hunter P. Wharton.

In connection with the order invoking supervision, a notice of a hearing was given for Washington on August 26. Such a hearing was held with the same Mr. Carter as Hearing Officer, and Mr. Thomas, the then General Counsel of the International Union, being present. After the hearing Carter made a report to the General President and the General Executive Board recommending the continuance of supervision, which has since continued to this day. After that hearing he also filed written charges against Underwood complaining of his actions in connection with the events between May 1 and August 14 of 1952, and asked that Mr. Underwood be disciplined in accordance with the procedures set forth in the Constitution of the International Union.

Mr. Underwood was served with a written copy of the charge and had the opportunity to and did reply. A hearing was set for the Commodore Hotel in New York in September. The hearing was held, and Mr. Underwood, as the result of and after the hearing, at a meeting of the Executive Board, was found guilty of the charges as preferred and was suspended for six years and fined $3,500.

That brings us to the period from September of 1952 to May of 1957, the tenure of one Hunter P. Wharton. I

---

7. Page 3 of D–23; R. 890, 891; Page 1 of D–19. Note the willingness to defy and ignore *any* action taken by the International. The bad faith of the local and its officers is again made quite evident.

8. D–45; R. 3097.

believe the less I have to say about that the better it will be. A discussion of his tenure is not necessary to a decision of this case, but the Court has certainly been convinced that Mr. Wharton, as far as the actual personal dealings with the members of the Union, is a worthy successor of Jasper White. His tenure has been marked by violence at meetings. People have been denied the right to talk, and there is no doubt in my mind that Underwood and his adherents have been discriminated against in job selection.

It has not been established to my satisfaction, however, that the contracts by Wharton have been other than favorable to the membership, in that they are improvements on preceding contracts, and the scope and extent of coverage of the Union in this particular area has been greatly extended during his period. I cannot and do not condone the violence that has been exerted by some of his business agents, nor their goon-like tactics of terrorizing meetings, and I particularly deplore the attack on a gentleman who appeared to me to be a pretty decent human being, and that is McCarty. I think, however, that McCarty was led into that situation by another member of the Union about whom I may have to say something later.

I have reached an equally firm conviction that Underwood and his adherents did nothing to stabilize or tranquillize matters. I think it is perfectly clear from the evidence that has been produced before me in this case that they aggravated the situation.

I have outlined the general facts. I now proceed to a discussion of the law of the case and to the application of the facts to the law as I have determined it to be in this case. First of all, the Court must have jurisdiction of the action before it can render a binding decision.

In that connection, let us first take the Underwood case, Civil Action No. 14398. The action is in this court by reason of diversity of citizenship. Underwood is a resident of Pennsylvania and Maloney is a resident of Illinois. The evidence has clearly established that more than the statutory sum of $3,000 exclusive of interest and costs is involved, so if there is a justiciable controversy between these two parties the matter is properly in this court. 28 U.C.S.A. § 1331.

One of the problems involved in that determination is whether there must be an exhaustion of internal union remedies. There is a legal principle in connection with disputes of members and unions that an aggrieved person must use all reasonable internal protections of the Constitution and By-Laws which are available to him.[9] If reasonable internal protections are not afforded, there is no question of the right of the individual to come to court. If reasonable protections are set up and the aggrieved person attempts to use them and can't get a decision, that may well spell exhaustion of internal union remedies.[10] The law is clear, however, that exhaustion of internal remedies is not required where there is a property right involved or where the plaintiff is seeking damages on the basis of loss of wages and employment protection. That is the case of Heasley against Operative Plasterers & C. F. I. A., Local 31, 1936, to be found at 324 Pa. 257, 188 A. 206, opinion by Justice Stern.

The logic behind such a rule is clear. While an appeal to an Appellate Review Board within the Union might obtain reinstatement, if there is an expulsion, or a lifting of a suspension, the Union has no power to award damages created by its own misdeeds. The law even goes further and says that, even absent a suit for damages, if illegal procedures are used in suspending or expelling a member, or that there was bad

9. Underwood v. Maloney, D.C., 14 F.R.D. 222; Trainer v. International Alliance, 1946, 353 Pa. 487, 491, 46 A.2d 463.

10. See cases cited in 168 A.L.R. 1462, 1477, 1478.

faith in the action taken on the part of the Union authorities, or if there is no effective right of appeal, exhaustion of remedies is not necessary;[11] and when I mention illegal procedures, I have in mind the failure on the part of the Union to comply with the protection granted in the Union's own Constitution, as properly interpreted in the light of due process, both procedural and substantive.

■ Should the Union attempt to arrogate to itself powers not granted by its own Constitution, that would also spell illegal procedure.[12] In the Underwood case nearly every one of the factors not requiring exhaustion of remedies before the institution of suit have been alleged in the complaint and evidence has been offered in support of those contentions. It must follow, therefore, that Underwood's present suit was properly filed and that the Court has jurisdiction both of the parties and of the subject matter of the suit.

Now we turn to the Dawson suit, Civil Action No. 14547. With respect to this suit, all that I have said with respect to jurisdiction in the Underwood suit applies equally, with one additional problem which was left for determination at the time of the trial of this case. That question is whether the named plaintiffs and such other Union members as appeared to testify represent adequate representation of the entire Union membership.

At the outset I am confronted with the opinion of the Circuit Court of Appeals of the Third Circuit in Giordano v. Radio Corp., 1950, 183 F.2d 558. In that case Giordano was expelled by a rather close vote of the entire membership of the Union. He brought suit on behalf of himself, the expelled member, and 15 other members who were likewise about to be expelled. The court in that case held that he was attempting to vindicate a personal rather than a class right.

In this case Dawson and his co-plaintiffs are seeking to set aside the order of supervision on the ground that the President was without authority to issue it and that all of the members of Local 542, an unincorporated association, were denied procedural aud substantive due process, which made null and void the continuance of the order entered on August 19, 1952.

The evidence in the record in this case discloses that not only the named plaintiffs in this action, but the entire Executive Board, composed of some of the plaintiffs in this action, voted unanimously to support the legal action against any effort of the International officers to interfere in any way in the conduct of the Local, which, of course, would include the invoking of supervision over the affairs of the Local. We also have the uncontroverted minutes that on the day after that vote, which was August 4 of 1952, that on August 5 of 1952, several hundred of the 4,500 members of the Union at a meeting unanimously, so far as the minutes show, reaffirmed and approved the prior action of the Executive Board.[13]

■■ It would appear, therefore, to the Court that the factual situation in this case is so different from the Giordano case that the ruling of Judge Maris and the principle of law there enunciated are not applicable to the facts of the present case.[14] I hold, therefore, that there has been a sufficient showing of adequate representation of the class for the purposes of the relief claimed in the Dawson suit, and I therefore hold

11. Riverside Lodge No. 164 v. Amalgamated Ass'n, D.C.W.D.Pa.1935, 13 F. Supp. 873; McGinley v. Milk & Ice Cream Salesmen, 1944, 351 Pa. 47, 51, 40 A.2d 16; Heasley v. Operative Plasterers & C. F. I. A., Local No. 31, 1936, 324 Pa. 257, 261, 188 A. 206; Gordon v. To-

mei, 1941, 144 Pa.Super. 449, 19 A.2d 588.

12. McGinley v. Milk & Ice Cream Salesmen, 1944, 351 Pa. 47, 40 A.2d 16.

13. Page 3 of D–23; R. 890, 891; Page 1 of D–19.

14. Also, see, 3 Moore S 23.08, p. 3434.

that the Court likewise has jurisdiction of the action in the Dawson case.

I think perhaps that such a finding in this case is fortunate. There are many reasons why this case should be decided once and for all and finally. Disputes of this nature have a terrific impact on the little fellow, and he is the one that suffers, and we must get a determination so that all parties to this action will know their respective rights and their liabilities and obligations.

It is clear that there is a cleavage in this organization and that the funds have been contributed by a group for the purpose of waging these very lawsuits, and it is entirely clear, from what I have seen in this court between February 4, 1957, the start of the case, and May 3, of 1957, which was the last day of the trial of this case, that there is extreme bitterness, and I feel that a decision may be of help in ending this most unfortunate and unnecessary situation.

We have now reached the point where a discussion of the applicable law to the facts of the case as I have heretofore found them is in order. There are two separate and distinct cases here, which will require individual and joint treatment. First of all, let us take the Underwood case. This is a conflict involving an individual who stands suspended because of alleged misdeeds, and we now must apply the law governing suspension as it affects him as an individual and the rights of the Union to impose such a suspension.

■ I have heretofore referred to the law governing a situation like this. Stated simply and in general terms, the law requires that the International obey its own Constitution and afford the accused procedural and substantive due process of law. That due process properly includes, as the courts of Pennsylva-nia have so often said, procedures in conformity with the law of the land, which means legal due process. There is one limitation to this general statement, however, which is important in this case, and that is that due process accorded within the framework of an unincorporated association does not necessarily mean due process as ordinarily interpreted in a judicial proceeding.[15]

■ Mr. Justice Stern in an opinion used an expression which I think is applicable in most of these situations. Technically, due process of law as referred to in legal proceedings requires certain niceties of procedure, such as the right to representation by counsel, a stenographic record, and certain other safeguards which are accorded to any suitor in the courts of the United States. The distinction of due process within the Union framework is this: The courts have never held that the requirement that a person be represented by a member of the Union, as contrasted to outside counsel, has been other than valid.[16] Neither have the courts ever held that a person is entitled to a stenographic transcript unless one actually was taken. So two of the complaints in this case fall immediately.

■ We also have certain other requirements which I will advert to in a few moments, but there are two fundamental principles of law which I want to make clear at this point. The courts do not look with favor upon interference by the courts in the internal workings of any fraternal, religious, or labor organization. If, in the matter of discipline, the court finds that substantial conformity has been had and that substantial justice has been done and the procedures have been fair and reasonable, the courts are extremely reluctant in any wise to interfere in the operation

15. Williams v. National Org'n, 1956, 384 Pa. 413, 417, 120 A.2d 896; Raynovic v. Vrlinic, 1939, 334 Pa. 529, 531, 6 A.2d 288.

16. Raynovic v. Vrlinic, 1939, 334 Pa. 529, 531, 6 A.2d 288; Local No. 2 v. Reinlib, 1943, 133 N.J.Eq. 572, 33 A.2d 710;

Greene v. Board of Trade, 1898, 174 Ill. 585, 51 N.E. 599, 601, 49 L.R.A. 365; A different situation is of course presented where the union Constitution grants an unqualified right to outside counsel; See Riverside Lodge No. 164 v. Amalgamated Ass'n, D.C.W.D.Pa.1935, 13 F.Supp. 873.

of an unincorporated association such as this.[17] Where, however, an adjudication by a trial committee, or succeeding appellate bodies within the Union, of the guilt of an accused individual or even a Local itself of the International involves certain specific and well defined procedures without which the courts have generally held the accused has been denied the right of due process, the courts do not hesitate to interfere.[18]

■ What are those requirements? First, it must be clear that the Union hearing complied with the Union's internal law. Article VI, Section 6, of the Constitution involved here requires that any and all members, local officers and local unions affected or aggrieved by any act or decision of the General President, may demand a hearing thereon before the General Executive Board, with appeal to the general convention in the manner described within the Constitution.

Pennsylvania courts have uniformly interpreted such a provision that there must be in the proceeding a findings of fact in a general form, as contrasted to the court requirement of a very specific form, (2) a decision that the accused has violated some provision of the Constitution or rules of the organization, (3) that he has been informed of what he is accused, in other words, that written charges must be presented, that the accused must be notified of the time, place, and purpose of the hearing, which has to be conducted with some degree of specificity and formality, and (5) that the decision clearly state the result and the penalty.[19]

Now, that generally states the law of the Underwood case. I want to make it

extremely clear, since there are so many people present in the courtroom this morning, that this case is not being decided in the news columns, nor in connection with any matters presently before any legislative group, nor on the basis of any propaganda in newspapers or periodicals which has been instigated by any party to this action, and there has been a lot of it since it started, but the determination of the Court this morning is made on the record made in this courtroom and the exhibits entered there and nothing else.

■ Now, what does the record show? From a re-examination of the entire record, the Court has been impressed with the fact that Union members between 1938 and 1948 were not very well treated by their superiors, the men who had the business conduct of the Union in charge, and whose activities would affect what I choose to call the little man. Two of the most glaring faults with the operation of the Union were the percentage assessment of wages and the practice of charging a weekly license fee for the privilege of working as an operating engineer. They were glaring abuses, and I may say that while it is unimportant to a decision in this case, I have no doubt that a lot of these percentage payments reached pockets other than the pocket of the Union Treasurer. The fact that that practice was discontinued at the time Maloney came in may have a bearing in the light of future developments.

Underwood attempted to take credit for the abolition of the permit fee. That claim is not borne out by the record. Before he came to power the then supervisor had been peremptorily ordered by

17. Williams v. National Org'n, 1956, 384 Pa. 413, 417, 120 A.2d 896; McGinley v. Milk & Ice Cream Salesmen, 1944, 351 Pa. 47, 53, 40 A.2d 16 (Dissenting Opinion).

18. McGinley v. Milk & Ice Cream Salesmen, 1944, 351 Pa. 47, 51, 40 A.2d 16.

19. McGinley v. Milk & Ice Cream Salesmen, 1944, 351 Pa. 47, 51, 40 A.2d 16; Heasley v. Operative Plasterers, 1936, 324 Pa. 257, 262, 263, 188 A. 206; Weiss

v. Musical Mut. Protective Union, 1899, 189 Pa. 446, 42 A. 118; McKee v. Huddell, C.P. Allegheny County 1924, 73 P.L.J. 113; McKee v. O'Neil, C.P. Allegheny County 1924, 72 P.L.J. 791; National Organization Masters, Mates & Pilots of America v. National Org'n Masters, Mates & Pilots of America, Local No. 2 (C.P.No. 6, Philadelphia County, December Term 1950, No. 6852, opinion, 1952).

Maloney to discontinue that practice,[20] so that Underwood's problem was merely to put into effect what I consider to be a proper action on the part of the International President to secure peace within a local organization.

I have adverted to the fact that during the period of 1938 to 1948 Carter signed some contracts in Fay's name. That Fay probably designated him to do it I have no doubt, because I have been unable to find that Fay had any appreciable influence on the operation of the union between 1938 and 1948, but Jasper White did, and there is no doubt in my mind, from the Feinsinger arbitration and the report, that Jasper White might well have pleaded the Fifth Amendment in his conviction for contempt of Court, because I think the record in this case as presented to me clearly shows that while he obtained apparent advantages in contracts which would be favorable to union membership, they were obtained from the contractors without much argument for what he called window dressing, with no intention of enforcing them against the particular contractors involved.

What he may call window dressing I choose to term methods of extortion, because the record of that Feinsinger arbitration clearly shows that he used those on the job and they were settled on the job, and the inference is inescapable that he settled difficulties by extorting moneys from the contractors for his own personal greed. However, with the exception of his short reappearance in the Baronett matter, which I have already characterized, Jasper White is no longer in the picture, and what he did at that time now has no bearing on this case.

But what was the position of the International? We are dealing here with two men, Underwood and Maloney.

What was Maloney's position when Underwood came to power, and we must recall that he threw no block at Underwood coming to power on the basis of the Court of Common Pleas No. 2 suit. The record is clear that Maloney gave him every assistance he requested. He sent McDonald, his third International Vice President, into Philadelphia to help him,[21] and the record shows that he did help him. An objective rereading of the entire record in this case clearly shows that McDonald played a large part in bringing the harmony and the well-being of the union into existence in what I have termed as perfect handling of the union during the time that I mention.

That Underwood was a dynamic individual who had the complete confidence of an extremely large percentage of the members is also evident. That is not in the slightest degree surprising. For a period of ten years union meetings in the real sense had been practically non-existent. There was a turmoil any time anyone attempted to speak his mind. No one was permitted to talk unless in support of Jasper White or his cohorts. Properly and intelligently Underwood insisted that every member who wished to speak be given the opportunity without interference from other men. As I have previously stated, there was some trouble at first, but eventually that system was carried out, and so it does not come as any surprise to the Court, and it is clearly evident here, that Underwood's Executive Committee would follow his slightest wish as if it were a command.

I have adverted to the fact that Underwood, however, in 1948, within two months, struck national contracts in violation of the constitution.[22] That was overlooked, but nevertheless it was a violation. Underwood has complained of Maloney all through the period, and one

20. R. 743, 744 (Assessments); R. 560–562, 580–587, D–6, D–7 (Maloney cut out permit fees).

21. Jasper White resented this. R. 510. Note however, that it was this same Underwood who ignored McDonald in negotiating contracts, including those with the local association, after 1947. R. 531, 535, 536. R. 1914.

22. R. 580–587; D–6, D–7.

of the serious complaints that he makes is the Turnpike situation in 1949. That he might have a complaint against Hunter Wharton is clear to me from what happened in the organizing of the Turnpike, but when Underwood attempts to put the onus of any difficulty or failure of results on Maloney, his evidence falls far short of conviction.

Underwood's evidence has completely convinced me that the organization of the Pennsylvania Turnpike was instituted by Maloney alone. It resulted in a substantial increase in membership in 542. Despite an Underwood letter in September of 1949, which was carping and critical, he admitted some two months later that Maloney and Maloney alone by exerting pressure at different points throughout the country brought the contractors into line so that the entire turnpike area was covered by proper union contracts.[23]

As I have said, after that episode, and certainly up until the time of 1950, Underwood's tenure was marked with the complete approbation of both Maloney and McDonald. I have already commented upon the 1950 contract and the Kelly incident and what happened up until 1952, and I do not need to repeat it.

What is the real situation in that crucial period between May 1 and August 19 of 1952? I am not in the slightest degree impressed with the open-end provision of the independent union contractors. I am of the firm conviction, reinforced by a complete review of the record, that while Underwood made a reasonable contract with the independents, he at no time had any intention of making any contract with the local contractor associations, and what evidence is there to support that conclusion?

There certainly is no evidence here that is credible, in my opinion, that he attempted to bargain in good faith. The

demands which he made on the local associations he did not make against the independents, and if they were important to his membership, they were more important to have with 450 contractors than with less than a hundred. He didn't think it important enough at that time, but he did make the demands which have been termed in the course of this proceeding outrageous against a few people,[24] and what was the reason behind it? That there was bitterness between Halloran and Underwood, perhaps on a professional basis, perhaps on a personal basis, is well known to the Court, because both of them were before me in a preceding suit.

In that situation what did Halloran do? I have already castigated him for union breaking, which I think is despicable, but in the favorable economic position that Underwood was in, Underwood was in a position to bankrupt the contractors and to destroy their association. That he did not at any time attempt in Philadelphia, with the contractor associations, to bargain in good faith, as he was required to do, is to me crystal clear from this evidence.

Now we come to the great part of the conspiracy about which I shall talk later, the conspiracy between Attorney General McGrath and Maloney and others. Carter was thrown in, I think for good measure, I am not sure. I haven't looked at the caption in the last two days.

What is the evidence produced here? That Halloran's attorney sought out the services of a man who had been until a relatively few days before the Attorney General of the United States for the purpose of enlisting his aid with the higher echelons of the union and with the Government of the United States does not strike the Court as being one bit surprising nor it is in the slightest degree unethical. The picture sought to

---

23. R. 592, 593, 589, 590, P–13, P–13A, P–15, P–16—P–23.

24. There was a total of 625 contractors within 542's jurisdiction and only 98 be-

longed to the local contractor's association; the association employed only 350 members out of a total of 3800; see Page 2 of P–57.

be painted, that General McGrath went first to George Meany for a favorable approach to Maloney, a man whom he had met theretofore only casually, when George Meany's daughter was his secretary, strikes me as not being unethical, not being criminal, not being venal, but practical, good, everyday horse sense. That he would in Chicago give Halloran an opportunity, which he never had, to state briefly his opinion of Underwood's attitude and what Underwood was trying to accomplish, does not in the least bit surprise me, and the fact that a man of McGrath's stature received $15,000 in an important case does not strike me as proving anything in the nature of a conspiracy, and I see absolutely nothing wrong with it.

On the contrary, one element in this case which has been entirely ignored is this: I am not so far out of the practice of the law that I don't recall that when I would associate a lawyer in another city to represent me in a certain situation, that lawyer, before he sent his bill would discuss it with me, and then and there the amount to be billed the client was determined and a forwarding fee was determined; and that has been entirely ignored in this case, that it probably wasn't McGrath that set the fee. It was probably Jacoby, and Jacoby got $10,000 out of it, out of which he put $7,000 in his pocket and gave his partner $3,000. I see no evidence in this case of dishonesty, and I regret sincerely that there has been any implication in the slightest degree of dishonesty against a worthy lawyer, no matter whether he happens to be a Philadelphia lawyer, a Pennsylvania lawyer, or a lawyer of another state.

Now, what else do we have? We have the inference which I am asked to draw that Halloran and his group, who had had dealings, proper professional dealings, with Carter before in Jersey, because they operated in Jersey and they had to do business with him, went to see him and pleaded with him to talk to Maloney, and the only evidence in the case is that Carter in the first instance gave them absolutely no encouragement. The fact that he might have properly, with thoughts of good trade unionism, carried the story to Maloney, just doesn't ever seem to occur to the plaintiff in this case. There is an attempt to ascribe every bad motive to everyone who opposed Underwood in this case, and he surrounds himself with a halo of sanctity and holiness which isn't borne out by the record.

In the posture of the case in June and July, I disbelieve Underwood's statement of what happened in Washington, that he was told to maintain his demands. I believe Maloney, that Underwood asked for a few days to settle the strike.

I disbelieve Underwood's account of the Chicago conference. I believe Maloney's account that there was agreed to by Underwood, with a promise to submit it to the membership with a recommendation of acceptance, the independent contract as it then existed, with four variations of minor degree which could very readily be submitted to arbitration.

What happened when Underwood came back from Washington and came back from Chicago? He insisted on every one of the demands listed on Exhibit P–178, not one of which was required of the independents previously mentioned.

This information had to get to Maloney. Much is made of the fact that he sent Carter in to break the strike, and I believe from the evidence that the only intention on the part of Maloney or his then representatives was to settle, not to break the strike. Underwood would never have settled the strike until he had bankrupted all of the contractors involved or driven them out of the association.

What was Maloney to do in that situation? Despite the fact that Carter has been painted throughout this picture by the plaintiff as a scoundrel, a rogue,

and a thief, the only documentary evidence that we have in this case[25] shows him to be a keen, intelligent, honorable, honest purveyor of facts, and those are the facts that came right from the plaintiff's own mouth.

That there was some dissembling on the part of Carter and Maloney I agree. Carter was sent in here as more than an observer in the contract negotiations. He was sent in here to enter into the negotiations, if necessary, and I think that that dissembling was to protect Underwood's position, and instead of its being characterized as an underhand, secret deal, I think that Maloney is to be commended for trying to uphold in that difficult position the picture of Roy Underwood as president of Local 542.

That is the impression I have from the case. James McDevitt, of the Building Trades Council, said that he was most interested and that he had time and time again asked Maloney to do something about this situation, that 8,500 people were walking the street. It hasn't been denied that he did so, but the innuendo was raised that he wasn't a good trade union member. I think Mr. McDevitt's record clearly indicates to the contrary.

What was Maloney to do in a situation like that? Here was a situation where the Governor of the State and all of the associate trades in Philadelphia were pounding Maloney. He was convinced, because he had been told by Underwood, that Underwood intended to break the contractors and break the association.[26] He tried to persuade him not to do it and gave him an opportunity on several occasions not to do it, but what was Underwood's attitude? They had to go.

Now, much as I despise the action of union breaking, it is a two-edged sword, because anyone who unwarrantedly attempts to break individuals and associations is likewise in the same category that I put Halloran. Maloney was faced

with an intolerable situation. The lawsuit had been started to effect what Underwood testified to here on this stand. True it had been started—because he dominated that union—to test the validity of that order. The order was valid and within the power, under the constitution, of the General President. If that suit was successful, international unionism as I know it in this country would have been destroyed. It is a question of the tail wagging the dog. Underwood attempted to determine for himself the constitutionality and the right of every order received from the General President. That attitude was observed all the way through his conduct of office. It is unfortunate, because until he developed that, he had great potential. That is shown in his attitude toward the Building Trades Council. When they called him on the carpet for not doing something according to the rules, he said, "You are anti-labor. Get out." When Maloney was pushing him to organize the Turnpike, he said "You are anti-labor. You are entirely responsible." That has been the attitude. He has been right; nobody else possibly has been right.

But Maloney's order was valid, and Underwood should have obeyed it and taken his appeal if he felt it was wrong. I find that Maloney acted in the utmost good faith, and I commend him for his patience in dealing with Roy J. Underwood.

What happened after that? Underwood would have me decide that he was discharged for bringing a lawsuit, the lawsuit of the first half of August of 1952, and for what he said therein, which violates his constitutional rights.

 Let us see what actually happened. Written charges against Underwood were filed and he had an opportunity to answer them.[27] He appeared at a hearing which was conducted in a semiformal manner well within bounds of decency and reason. The evidence was presented and the allegations of the

25. P–190.

26. R. 1986.

27. P–53, P–57, P–59.

complaint in Civil Action No. 14071 were read. If all the testimony in support of the allegations which the plaintiffs had at that time has been introduced in this lawsuit, the charges were entirely unwarranted and unfounded. Underwood himself admitted he had a fair hearing [28] and I find that the result reached was within procedural due process and substantive due process.[29] The Executive Board made its decision uninfluenced by Maloney, although plaintiffs asked me to find directly to the contrary.[30] The basis for that charge is that Maloney had the power to fix and cut off the pay of the Executive Board. Even that allegation is destroyed by the plaintiffs' own testimony.

What was the first charge against Underwood? The charge was that he was insubordinate and would not follow a proper order, lawful command, of the General President, in violation of the constitution, which is Exhibit D-3. Certain other charges referred to the suit, but we don't even have to reach them at all. The decision of the Board shows

that Underwood was suspended and fined for insubordination and refusal to obey a lawful command of his superiors. Swanson testified that he convicted himself out of his own mouth. That is entirely right. He did so in his answer. There was no further need for testimony. The suit was the evidence of his disobedience of a lawful command and was a piece of evidence.[31]

Justice Stern condemned a $1,000 fine when a man was making $32 a week.[32] Let us take Mr. Underwood's position. First of all, he was fined $3,500, admittedly the reasonable cost of the lawsuit which he was instrumental in bringing. The by-law under which that fine was imposed was adopted at a convention as a result of a recommendation of a Law Committee of which he was a member,[33] so Underwood didn't go blindly into something without knowing the consequences. Furthermore, he had the help of several hundred people there who seemed to be in his corner, and it has been evidenced here that they contributed pretty regularly to the support of this

---

28. R. 681, 682; R. 2383, 2384; R. 3342.

29. Maloney v. District No. 1, United Mine Workers of America, 1932, 308 Pa. 251, 257, 162 A. 225; Brown v. Lehman, 1940, 141 Pa.Super. 467, 474, 15 A.2d 513; Kerstetter v. Brotherhood, 1935, 41 Dauph.,Pa., 245.

30. See, concerning an uninfluenced decision, Fish v. Huddell, 1931, 60 App.D.C. 263, 51 F.2d 319, 320; Raynovic v. Vrlinic, 1939, 334 Pa. 529, 533, 6 A.2d 288, and Campbell v. Industrial Union, 1944, 33 Del.Co.R.,Pa., 204, 212; concerning a conviction out of the defendant's own mouth, see, Bogadek v. Butkovic, 1939, 336 Pa. 284, 287, 9 A.2d 388 and Zenz v. Mack Local 677, 1948, 23 Leh.L.J.,Pa., 39, 41, 42.

31. In addition to the Pennsylvania cases cited in footnote 30, see, Werner v. International Ass'n of Machinists, 1956, 11 Ill.App.2d 258, 137 N.E.2d 100, for an excellent discussion of the law in a case where the Court upheld the disciplining of a union member for alleged criticism of the manner in which the president was conducting negotiations for a collective bargaining agreement. Also, see, Hall v. Morrin, Mo.App.1927, 293 S.W. 435, 439, 440. In that case the plaintiff was charged with wrongfully bringing a court action against members of the general executive board and wrongfully and unjustly accusing them through false statements and gross misrepresentations causing dissension. The penalty was similar to the one accorded Underwood (437 & 438 of 293 S.W. of the Hall decision). In upholding the penalty the Court stated at pages 439 and 440, of 293 S.W., "While it is doubtless true that such averments in plaintiff's petition were privileged in law, in that they could not have been made the basis of an action against him for libel, the constitution, for the alleged violation of the provisions of which he was tried, having been assented to by him as a member of the International Association, was binding on him as a contract * * *."

32. McGinley v. Milk & Ice Cream Salesmen, 1944, 351 Pa. 47, 59, 40 A.2d 16 (Dissenting Opinion); but note the peculiar facts of that case as well as Justice Stern's learned exposition of the applicable law with reference to so many of Underwood's contentions from page 52 through 59, of 351 Pa., from page 18 through 21 of 40 A.2d.

33. R. 468, 469, 470.

lawsuit, so I don't think it is out of order to comment at this time on the imposition of such a terrible penalty as $3,500. As to the 6-year suspension, with right to work, I think under the circumstances that it showed complete mercy on the part of the General Executive Officers.[34]

Mr. Underwood comes into this court asking for substantive and procedural due process, and this Court will see that he gets it, but I just want to point out that this is a proceeding in equity, and what did Mr. Underwood do with the poor little fellow that took a day's work during a strike that he engineered? He had him brought before a rump court and fined $200 and suspended three months without a written charge.[35] So it seems to me that he who demands the protection of the constitution should in the first instance give that protection.

I have no doubt in this case as to the result. Underwood's charges and trials were strictly in accord with the constitution as I have interpreted it. He had procedural due process—notice, charges in writing, opportunity to answer, hearing, determination, findings, penalty. True it was not judicial due process, but it was substantive justice and substantive compliance with the law of the land and the constitution. As I have said before, he based his case in some measure on the right to a stenographic transcript and an absolute right to counsel. To that he was not entitled, under the decided cases.

■ Now, let us turn to the union. What about the Dawson case? That presents an entirely different proposition. The union itself set up its measure of action in connection with recalcitrant or stubborn unions. I am passing over the arrogant demand of some of the members that Maloney appear before them and give them his reason for doing what was entirely proper under the circumstances, but the union itself has been taken under supervision, and the union as such has equal rights which must be observed, and the union itself is entitled to the same treatment that was accorded Underwood.[36]

There is no doubt in the mind of the Court that the General President properly has the power, as he did in this case, summarily to invoke supervision, and that that supervision can be temporarily exercised without violating the rights of a local union;[37] but, as I said before,

---

34. See Sanders v. International Ass'n of Iron Workers, 6 Cir., 1956, 235 F.2d 271.

35. R. 2783–2800.

36. The imposition of supervision is something more than a mere executive act. See Riverside Lodge No. 164 v. Amalgamated Ass'n, D.C.W.D.Pa.1935, 13 F. Supp. 873 (disciplinary action against subordinate lodge requiring proper procedures); O'Neill v. United Ass'n, 1944, 348 Pa. 531, 36 A.2d 325; Heasley v. Operative Plasterers, 1936, 324 Pa. 257, 188 A. 206; McKee v. O'Neil, C.P. Allegheny County 1924, 72 P.L.J.,Pa., 791; McKee v. Huddell, C.P. Allegheny County 1924, 73 P.L.J. 113; National Organization Masters, Mates & Pilots of America v. National Organization Masters, Mates & Pilots of America, Local No. 2, (C.P. No. 6, Philadelphia County, December Term 1950, No. 6852, opinion, 1952). A thorough analysis of the extensive property and personal rights involved by virtue of the order imposing supervision in this case makes it quite clear that Maloney's action was not a mere executive action, and he recognized it as something more than that when he immediately provided for a "hearing" on the order. *Also note the right to a hearing granted by Art. VI Section 6 of the constitution, p. 23.* Obviously, as the above cases and constitutional provision indicate, an order imposing supervision under the circumstances of this case must be issued within the confines of both procedural and substantive due process. The dictum in the cases of Bogadek v. Butkovic, 1939, 336 Pa. 284 at page 288, 9 A.2d 388, at page 390, and Zenz v. Mack Local 677, 1948, 23 Leh.L.J.,Pa., 39 at pages 41 and 42, though sound, is not applicable in this case in that respect.

37. With such vast assets involved a summary power, subject to a subsequent hearing, is not only reasonable but essential when properly exercised in good faith and based on reasonable grounds. Note that Maloney has offered to conduct a new election in order to return the local to local independence, and that it is the plaintiff who has come into court and

everyone under this constitution is entitled to a hearing, and that hearing must meet procedural and substantive due process, and due process generally is known as the law of the land.

What are the facts in the union case? The facts in the union case are that the reasons for imposition of supervision—and proper ones, in my view—are set forth in the order invoking supervision. Conceivably someone might have thought they contained a statement of charges, but I do not so regard it. For substantive due process there must be reasonable grounds and good faith.[38] The invoking of supervision was proper, was done without malice, was done in good faith, but how about the procedural due process? Where are the written charges? Where is the opportunity to answer? Where is the opportunity to secure evidence to refute the charges? Where is the hearing before the duly constituted Trial Committee at which evidence is given in support of the charges before the union is called upon to meet them, and where is the opportunity for the union itself to present evidence to refute such charges?[39] Where has that been shown in the record in this case?

I point out too that there is lack of notice. The cases uniformly hold that notice of the charges and of the hearing must be given to the union, and that provision has been further interpreted as requiring notice to the entire membership of the union and not the officers.[40] It is the union's property and the property of the members of the union that is at stake here, and as members they are entitled to notice.

I have stated the problem. The answer is obvious. The order invoking supervision was not followed by procedural due process. I hold that the International officers did not follow, as far as Local 542 is concerned, due process. I will have something to say about that, since I have found that it is in substantive good faith, in my order in connection with that case.

█ Another factor which has to be decided in this case is the question of costs. These cases have been tried together and have been consolidated throughout. The testimony indicates that the expenses of the plaintiff have been borne by contribution of money of the members of the association. I have given considerable time in this proceeding to thinking about this question. It seems to me that there is right and considerable blame on each side. In justice, therefore, it is the opinion of the Court —and I will read the order very shortly —that while the verdict will go against Underwood in the first case and against the International in the second, each side should bear its own cost, and it will be so ordered by the Court.

While I have no right and no authority to comment on the conduct of any organization, business, or union, I can't help but say this at this time: This case will be over, subject, of course, to the rights of appeal. It is apparent to the Court, crystal clear, that under the leadership of Hunter Wharton and Henry Lavery there will never be any chance for a decent operation, and I am stating it of record, and Mr. Maloney does not have to follow my advice, and he can tell me

---

acquired the injunctive relief precluding such action.

38. Gordon v. Tomei, 1941, 144 Pa.Super. 449, 19 A.2d 588.

39. Weiss v. Musical Mut. Protective Union, 1899, 189 Pa. 446, 42 A. 118 (charges); Heasley v. Operative Plasterers, 1936, 324 Pa. 257, 188 A. 206 (opportunity to answer and be heard); McGinley v. Milk & Ice Cream Salesmen, 1944, 351 Pa. 47, 40 A.2d 16 (without presumption of guilt). McKee v. O'Neil, C.P. Allegheny County 1924, 72 P.L.J.,

Pa., 791 (notice, charges, formal decicision); McKee v. Huddell, C.P. Allegheny County 1924, 73 P.L.J.,Pa., 113 (findings, decision, charges, notice, non-technical court rules); National Org'n Masters, Mates & Pilots of America v. National Org'n Masters, Mates & Pilots of America, Local No. 2 (C.P. Philadelphia County, December Term 1950, No. 6852, opinion 1952) (charges, decision, notice, non-technical rules of court).

40. See cases cited in footnote 39.

to go mind my own business. They have outlived their usefulness in the way that they have conducted this organization since supervision has been invoked; and as far as the Frank Lentinos, the Johnny Wolgasts, the Dominic Mazzolas, the Willie Jacksons, the Peter DiPetros, the Tony Zirpolies, the Joe Altamuras, the Pete Pantaleos, and Eddie Edwards or Piscatelli, who have been terrorists, who have demonstrated complete unfitness to be in any position of authority, the quicker they are put out of the trade union movement, the better the trade union movement will be; and if I have misstated any names there and they were not of that group that dominated the meetings, attacked other people, ran crap games on the jobs, instead of policing their contracts, I humbly beg the pardon of the ones that I have wronged, but I think I have been pretty accurate in what I have said.

Mr. Maloney doesn't have to follow any advice the Court gives him, but those people will never bring peace. While they are around peace will never come to Local 542 in Philadelphia.

I will now rule on plaintiff's requests.

No. 1 is refused as stated.

No. 2 is refused as stated.

Nos. 3, 4 and 5 are refused as stated.

No. 6 is affirmed.

No. 7 is refused as stated.

No. 8 is affirmed.

Nos. 9 and 10 are refused as stated.

Nos. 11 and 12 are affirmed.

Nos. 13, 14 and 15 are refused as stated.

No. 16 is affirmed.

No. 17 is affirmed, deleting the words "relatively few" in the second line.

Nos. 18 and 19 are refused as stated.

Nos. 20 and 21 are affirmed.

No. 22 is denied.

No. 23 is affirmed.

No. 24 is refused as stated.

Nos. 25 to 35 inclusive are denied.

No. 36 is refused as stated.

Nos. 37, 38, 39 and 40 are denied.

No. 41 is affirmed.

No. 42 is denied.

No. 43 is affirmed.

No. 44 is refused as stated.

Nos. 45 and 46 are denied.

No. 47 is refused as stated.

Nos. 48, 49, 50 and 51 are refused as stated.

Nos. 52 to 59 inclusive are denied.

No. 60 is denied.

Nos. 61 and 62 are denied.

As to the conclusions of law, Nos. 13 and 16 are refused as stated; all others are denied.

As to the defendant's requests, Nos. 1, 2, 3, 4, 5 and 6 are affirmed.

No. 7 is refused as stated.

Nos. 8, 9 and 10 are affirmed.

No. 11 is denied.

No. 12 is refused as stated.

Nos. 13 to 49 inclusive are affirmed.

No. 50 is affirmed, eliminating and excluding subparagraph 2.

Nos. 51 and 52 are affirmed.

No. 53 is refused as stated.

No. 54 is affirmed, with the addition of the name Carter after the word "he" at the beginning of the second sentence.

No. 55 is affirmed.

No. 56 is refused as stated.

Nos. 57 to 61 inclusive are affirmed.

No. 62 is denied.

No. 63 is refused as stated.

Nos. 64 and 65 are affirmed.

Nos. 66 and 67 are denied.

As to the requests for conclusions of law, No. 1 is affirmed.

No. 2 is affirmed, with the addition of the following words, "as construed by the Court in its opinion." It refers back to the constitution.

Nos. 3 and 4 are refused as stated.

Nos. 5 through 10 inclusive are affirmed.

No. 11 is denied.

No. 12 is refused as stated.

Nos. 13 and 14 are affirmed.

No. 15 is affirmed, with the addition of the same words, "as construed by the Court in its opinion."

Nos. 16 and 17 are denied.

No. 18 is refused as stated.

Nos. 19, 20 and 21 are denied.

In the Underwood and Dawson cases the first order I am entering today reads as follows:

"And now, to wit, this 23rd day of May, 1957, the above cases having been tried and concluded and an Opinion and Orders entered by the Court as of this date, the Court being of the opinion that the injunction hereafter referred to has served its purpose and there is no further need for the restraint therein imposed on the defendants, it is

"Ordered, adjudged and decreed that the temporary injunction entered the 4th day of March, 1955, be and it is hereby dissolved."

The second order in the Underwood case reads as follows:

"And now, to wit, this 23rd day of May, 1957, the above entitled case having come on for trial by the Court, without a jury, requests for findings of fact and conclusions of law filed, and briefs in support thereof having been submitted by all parties and oral argument had thereon, and for the reasons set forth in the decisions of the Trial Judge rendered orally in open Court this day, the transcript of which will be later filed of record as the Opinion of the Court in this case, it is hereby

"Ordered, adjudged and decreed that judgment be entered in favor of the defendant and against the plaintiff in this action.

"No costs are awarded; each party to pay his own costs."

In the Dawson matter, No. 14547, the order reads:

"And now, to wit, this 23rd day of May, 1957, the above entitled case having come on for trial by the Court, without a jury, requests for findings of fact and conclusions of law filed, and briefs in support thereof having been submitted by all parties and oral argument had thereon, and for the reasons set forth in the decision of the Trial Judge rendered orally in open Court this day, the transcript of which will be later filed of record as the Opinion of the Court in this case, it is

"Ordered, adjudged and decreed that the prayer of the plaintiffs to set aside the Order of Supervision of the General President Maloney, dated August 19, 1952, over the membership, property and assets of Local 542 and its branches, 542–A, 542–B and 542–C, of the International Union of Operating Engineers, be and it is hereby granted, without prejudice, however, to the right of the International Union and its Officers to properly invoke and maintain supervision in accordance with the applicable provisions of the Constitution of the said Union and in conformity with the Court opinion, not later than September 1st, 1957.

"So as to allow sufficient time to the International Union and its Officers to properly invoke such supervision and since the Court is convinced that the well-being of the Union and the ends of justice require such action, the effective date of this Order is hereby fixed as of the aforesaid date, September 1st, 1957. The Court retains jurisdiction of the case for the purpose of altering, modifying or revoking this decree, as the interests of justice may require, conditioned upon any action taken by the International Union within the prescribed time limit.

"It is further ordered, adjudged and decreed that all other requests of the plaintiffs for relief be and they are hereby denied.

"No costs are awarded to any party; all parties herein to pay their own costs."

I am handing to the clerk the signed orders and the requests for findings of fact and conclusions of law, and I ask that they be docketed.

Mr. O'Brien. If Your Honor please, is your order in the Dawson case, although it is entered today, dated September 1, 1957?

The Court. It is effective as of September 1. It is dated today.

Mr. O'Brien. Thank you, sir.

Mr. Freedman. If the Court please, need I take exception to Your Honor's findings and conclusions now?

The Court. Oh, no. You have a formal exception to any that I have refused. I meant to say that.

Mr. Freedman. And to all of the findings and conclusions that Your Honor has denied, that I submitted, and to the findings and conclusions which Your Honor affirmed, submitted by the defendants?

The Court. Yes, you have an exception to each one of those, and in reverse it is the same.

### Supplemental Opinion

The above oral opinion has outlined generally the facts and the law upon which the decision of this Court is based. Necessarily, since it was delivered orally, in the presence of a large number of interested litigants, the respective contentions of the parties with respect to the application of the law of the case to the facts were not discussed. This supplemental opinion will be confined to a discussion of the various respective contentions.

The fundamental issue involved in this case is the validity of two orders issued by the General President of the International Union, namely, the order of August 11, 1952, directing the local to settle the strike, and the order of August 19, 1952, imposing supervision. It is the plaintiff's contention that both orders are invalid, and it is the defendant's contention that both were legal and proper when applied to the peculiar facts of this individual case. All other issues, such as proper hearing procedures and penalty, become pertinent only upon a finding that the orders were valid. Without such a finding the defendant's case would necessarily have to fall, without even reaching the question of procedural due process and the penalty involved. Hence an analysis of the pertinent sections of the constitution under which the General President issued the orders in question is essential at the very outset.

That it is important to read and interpret these sections of the constitution in the light of the then existing facts goes without question. It is in that light and that light only that the constitution of the International Union of Operating Engineers is being examined.

What were those facts? While repetitive, it is well at this point again to delineate them: The strike in question had lasted 104 days. A minimum of 6,500 and probably nearer 8,500 men of allied trades had been thrown out of work by the strike. Allied unions were exerting terrific pressure on the General President in behalf of their respective union craftsmen. Persons of extreme importance in the labor movement of the United States were importuning the National President to bring about a settlement of an intolerable situation. The Governor of Pennsylvania had forcibly brought to the attention of the National President that projects of the utmost importance to the health and general welfare of the Commonwealth of Pennsylvania were being tied up and delayed, interfering with the orderly administration of the functions of the government of the Commonwealth. The projects, involving $125,000,000 worth of construction, included important highways and turnpikes, bridges, schools, hospitals, and other state institutions.

Maloney had urged in a Washington meeting that the strike be settled, in the interest of the labor movement, not only of Pennsylvania, but of the United States. Underwood had at that time in-

dicated that the strike would be settled within a few days.

When the strike was not settled for several weeks, Underwood was called to Chicago and there agreed to the adoption of all of the provisions of the independent contract, a 40 cents per hour wage increase, and consolidation of the welfare funds. In Maloney's opinion, the matter was then practically over.

On his return to Philadelphia, however, Underwood returned to the old demands, in violation of his agreement, and persisted in them, thus completely demonstrating his lack of good faith in dealing with his International President. He was instrumental in the adoption of a resolution by the local Executive Board at a meeting of August 4, 1952, of complete defiance of any attempt by the International Union as such to settle the dispute. He was further instrumental in obtaining an affirmance of this resolution by the membership of the union on August 5, 1952.

Then and only then did Maloney act. It should be noted that up until this time Underwood himself had suffered absolutely no injury. On August 11, 1952, Maloney's first order was issued. This ordered Underwood to put the men back on the job within twenty-four hours and notify the International President of his intention to comply. Underwood still could not claim that he was aggrieved in any way. However, he chose to defy the order and instituted a bill in equity to enjoin the enforcement of the order, which suit he voluntarily agreed to dismiss with prejudice. It was then that the order of supervision was issued on August 19, 1952. It was only after a hearing with respect to the continuance of supervision, and on September 5, 1952, that Underwood was served with the notice of charges made against him under the constitution.

It is in the light of these facts that a determination of the rights of a General President under the general powers granted him by the constitution must be had.

What are the General President's powers and where are they found in the constitution? The pertinent sections are as follows:

### Article III

#### General Conventions

#### Powers

Art. III. Section 1.

"All the sovereign power, including the legislative, executive, administrative and judicial, of the International Union of Operating Engineers shall be vested in its General Convention when in session. Specifically, but not in limitation of the power thus vested, the General Convention may * * * supervise the operation of Local Unions, local, State and Provincial organizations and any other subdivisions and appoint supervisors and receivers when necessary; prefer charges against Local Unions, local, State and Provincial organizations and any other subdivision and officers (individually or collectively) or their members (individually or collectively) and order trials with authority to discipline those affected; * * * provide for the general welfare of the organization and its members; take all steps necessary to protect the interests of the organization; together with all other rights, powers, privileges and immunities not herein specifically denied."

### Article V

#### Powers and Duties of the General Executive Board

Art. V. Section 2.

"All the powers of the General Convention when in session shall, when the same is not in session, pass to and vest in the General Executive Board, with the exception of such powers as may herein be specifically delegated to the various officers and subdivisions of the International Union. * * * *"

## Article VI

### Powers and Duties of the General President

#### Art. VI. Section 9.

"All powers heretofore vested in the General Executive Board when in session shall, when the same is not in session, pass to and vest in the General President. * * *"

### To Review Cases and Interpret Laws, Etc.

#### Art. VI. Section 2.

" * * * He shall also be empowered to interpret the provisions of the Constitution and decide questions of law arising thereunder. He shall be vested with all the administrative powers of the organization."

### To Invoke and Administer International Supervision and Other Peremptory Powers

#### Art. VI. Section 3.

"He shall have power to direct and supervise all Local Unions, Local Officers and any other subdivision of the International Union and members. Whenever in his opinion the best interests of the organization require it, or Local Unions, Local Officers and any other subdivision of the International Union or members shall be deemed by him to be incompetent, negligent, or to have failed in carrying out their respective duties, or to have violated the Ritual, Obligation, laws, rules or decisions of the organization or its duly constituted authorities, he shall have full power to suspend or remove such individual members, suspend or remove such Local officers, suspend or revoke charters of such Local Unions or place such Local Unions and their officers and members under International supervision. * * *"

As Chairman of General Executive

### Board, Etc.

#### Art. VI. Section 5.

"* * * He shall have power to call upon any and all subdivisions, officers and members for assistance and advice when occasion demands or requires it. He shall be strictly accountable and responsible for the faithful performance of his duties and shall administer and enforce every law, rule, regulation and requirement of the Constitution, Ritual and Obligation. He shall be vested with unlimited discretion in the application and administration of his powers and duties. He shall be vested with such other powers and duties as the General Executive Board may from time to time specifically delegate to him."

A reading of the foregoing demonstrates clearly that the General President has all the powers conferred upon the General Convention and the General Executive Board when they are not in session, in addition to the powers specifically granted him by the constitution. Correlative with the powers of the President, the constitution also provides an outline of the obligations and duties of members and officers of local unions. The pertinent sections are as follows:

### Art. XXIII—Subdivision 3

### Duties of Members

Art. XXIII. Subdiv. 3. Section (a).

"Members of Local Unions shall conform to and abide by the Constitution, Laws, Rules, Obligation and Ritual, and the decisions, rulings, *orders* and directions of any authority of the International Union empowered by this Constitution to make them." (Emphasis supplied.)

Art. XXIII. Subdiv. 3. Section (b).

"The admission to membership in conformity to the Constitution, Obligation and Ritual constitute a contract between the member, his Local Union, the International Union and every other member therein, where-

by, in consideration of the benefits bestowed by such membership, he agrees that he will remain a member until expelled; that he will not violate the Constitution, Laws, Rules, Obligation and Ritual, and the decisions, rulings, orders and directions of the International Union * * *."

Art. XXIII. Subdiv. 3. Section (c).

"All business transactions and affairs of the International Union, its subordinate subdivisions and officers within the knowledge of any member shall be held, inviolate and private, from persons outside the organization."

### Art. XXIII—Subdivision 2

### Powers and Duties of Officers

### President

Art. XXIII. Subdiv. 2. Section (a).

"It shall be the duty of the President to preside at all meetings, enforce the Constitution, Laws, Rules, Ritual and customs of the organization; * * * to furnish the General President full and complete information on any subject within his control or knowledge when requested; and to perform such other duties as appertain to his office or which may from time to time be delegated to him by action of the Local Union or other authorities in the organization."

In the light of the foregoing and the vigorous contention of the plaintiff that Maloney was absolutely powerless to interest himself in the negotiation of a local with employers for a collective bargaining agreement, it is necessary at this time to present the situation in its true light, even though again repetitious. Despite the catastrophic situation which the Court has found was definitely brought about by Underwood's deliberate and premeditated actions, counsel for the plaintiff insists that the General President, even under the pressing emergency situation then existing, could not in any wise lend his good offices in attempting to effect an equitable settlement of the strike. Counsel proceeds on the assumption that the President had no such power even after he realized that the local president was not bargaining in good faith and was preparing to defy the General President should he order the men back to work.

The basis for this contention is that the constitution specifically refers only to the President's action when there is a strike in violation of an existing contract or to pro forma approval of a contract. This, he argues, precludes the President from entering into contract negotiations in any other situation.

From the facts then existing in this case it is clear to the Court that, in light of the broad powers of the National President, in addition to the specific powers of the President dealing with strikes and contracts, Maloney not only had the power but had a definite duty to interfere in the local picture and attempt to bring about an equitable settlement of the dispute.

It should be noted, as referred to in the oral opinion, that the General President had been completely in support of Underwood and had been always extremely helpful to him and that his obvious intention to bring about an end to an impossible situation came only after he had learned the complete facts from independent sources and realized that Underwood was not bargaining in good faith. This is particularly evident after the Chicago meeting, when, after Underwood had agreed to a fair and reasonable compromise of the situation, he returned to Philadelphia, repudiated his agreement in Chicago, and immediately and vigorously pressed his old demands, ignoring completely his agreement with the General President to end the strike.

Before discussing the situation further, it might be well to outline certain provisions of the constitution other than those dealing with the general powers of the Convention, the General Executive Board, and the General President (all of which are vested in the General President when the other groups are not in

session) which are pertinent to this discussion. They are as follows:

### Art. XXIII—Subdivision 11

### Relations With Employers

### Grievances and Procedures

Art. XXIII. Subdiv. 11. Section (a).

"No action shall be taken by any Local Union, Local Executive Board, Officer, Committee or Business Representative of a Local Union affecting the relations between an employer and the Local Union or its members unless authorized as hereinafter provided."

Note the immediate limits on the power of the local and its officers.

Art. XXIII. Subdiv. 11. Section (b).

"When a difficulty or a dispute arises between an employer and a member in good standing in a Local Union such member or members shall first report the same to the Business Representative * * *. If no settlement of the dispute has been effected then the authority investigating the facts connected with said dispute may, if vested with the power to do so, immediately order and direct any necessary action deemed as required under the circumstances, * * * through strike or by stoppage of all work, or by securing a strike of all such other trades and workmen as can be obtained. Where Local Unions are affiliated with Councils of Labor and like bodies in their respective communities such Local Unions may take such action upon grievances or disputes as shall be recommended or authorized by the Labor Councils and other bodies with which they may be associated regardless of whether such grievances or disputes arise between members of a Local Union in this organization or members of any other union, with employers."

Note that in the light of the union structure in which the General President has the unquestioned power to affiliate with national labor councils and to enter into national contracts, it is an extremely narrow construction of this constitution that would preclude the entrance of the General President into the contract negotiations in the circumstances of this case.

Art. XXIII. Subdiv. 11. Section (c).

"No Local Union through its committee, Local Executive Board, or Business Representative shall attempt to take or take any action involving a rupture of relations existing under a legal contract with any employer or declare a strike where such contract exists except upon the following reasons, viz.:

"1. Assisting trade unions or other union workmen.

"2. Assisting Councils of Labor or other bodies with which the Local Union is affiliated.

"3. Violation by the employer of the written contract.

"4. To protect the craft jurisdiction or the territorial jurisdiction of the Local Union.

Nor shall any such action be attempted or taken unless the same has been sanctioned by the General President of the International Union."

A fair reading of the above sections makes it clear that the limitations in the constitution upon powers to call and settle disputes are directed specifically to the *local unions*. Their power (local unions) is a limited one. A fair interpretation of the constitution in the fact situation described above would indicate that the local cannot even call a strike unless the four conditions are met, and then only with the approval of the General President. It is important to note that the ultimate source of decision is in the General President. Certainly, then, there is a very strong inference of the power in the General President to enter into an attempt to settle the dispute in the fact situation that confronted him in this case.

Another section in the constitution which bears investigation reads as follows:

Sanction of the General President

Art. XXIII. Subdiv. 11. Section (d).

"If the dispute shall not be settled and the Local Union shall desire assistance or strike benefits from the International Union the General President shall be informed of all the facts thereof, and, if in his opinion the grievance is a just one, he may give his sanction and give the support of the International Union to the action contemplated or already entered into by the Local Union, its Committee, Local Executive Board or Business Representative. *If, under any circumstances, the General President shall be represented by a deputy* in the investigation of a dispute or a contemplated action or an action that has already been entered into on the part of a Local Union, its Local Executive Board, its committees or its Business Representative, the deputy shall report in detail to the General President and the General President can through a deputy convey such sanction and support required as though present in person." (Emphasis supplied.)

A fair reading of this section, again in the light of the facts as presented and found in this case, indicate that the local union had a right under proper circumstances to engage in strikes, and so forth, but the Court cannot, as requested by the plaintiff, draw the conclusion from this section that such action by the local precludes the General President from lending his good offices to the settlement of a dispute where there is evident bad faith on the part of the local and the strike is of national importance and involves the general welfare of the people of an entire state. Such an interpretation would be completely at variance with the expressed intent of the entire constitution and would militate against the welfare, not only of the local, but of the entire international union.

Another clause of the constitution which is pertinent to the present case and demonstrates Underwood's contempt for the constitution reads as follows:

Contracts

Art. XXIII. Subdiv. 11. Section (e).

"All agreements and modifications thereof between Local Unions or the members thereof and the employers shall require, before becoming effective, the approval of the General President in writing, or by telegraph."

In discussing the above section it should be noted that Underwood, despite the explicit provision requiring approval of the General President, never requested such approval of the contract entered into with the independents in this case and that it was not until Chicago that Maloney understood fully that such a contract had been entered into and was acquainted with all its terms. It should also be noted that the constitution again provides that the power of the local union in contract negotiations is a limited one and that the scope of the power of the General President is both paramount and residual, particularly in the light of the facts as found in this case.

While this Court refuses to pass on the validity of the International Union of Operating Engineers constitution in a vacuum or to give a black and white approval of all its provisions in all circumstances, it will pass on it as applied in this case to the facts as found by the Court and as interpreted by this Court and the courts of Pennsylvania. It is in that posture and that posture only that the validity of the constitution is being judged.

The Court finds that the General President had the power, and in fact the duty, to enter into an attempt to settle the dispute between the local contractor associations and the local union and that he had the power, from the above sections of the constitution, to issue both the order to return to work and the order imposing supervision. This Court finds that the constitutional pro-

visions as applied are reasonable and not in violation of public policy, nor are they violative of any constitution or the law of the land. In short, Maloney had the power to issue the orders, and the membership of the local union and Underwood had the duty under their own constitution to carry out these orders. This conclusion is based on the facts as found and which are set out in extenso at the beginning of this supplemental opinion.

It has been argued on behalf of the plaintiff that the demands, unprecedented in the history of collective bargaining, and which have been castigated as outrageous in the trial of this case, were mere window dressing and subject to negotiation and that the Court should not seriously consider them in determining Underwood's good faith. That argument defeats itself in light of the facts as I have found them. Underwood, who had agreed in Chicago to forego the extreme conditions and work out a proposed contract in several respects even more advantageous than the reasonable provisions of the independent contract, returned to Philadelphia and repudiated his agreement. He obtained authority to defy the General President. All demands were unequivocally pressed by Underwood up to the point of the injunction suit against the General President. The Court would be extremely naive to conclude that these were mere window dressing. They were the product of Underwood's vicious attempt and intention to "break" the local contractor associations.

What is the status of Underwood's hearing? Underwood was charged with three violations of the constitution. This Court finds that the violation of the first was a sufficient ground for the imposition of the penalty given. The violation charged was (1) *The refusal to obey the orders of the General President.* What evidence is there in this case to support that charge?

Underwood early in his career refused to obey the orders of the General President when he struck in violation of national contracts. He did it again in his organization of the turnpike. He did it again by failing to secure the General President's approval of the independent contract; again when he left the Building Trades Council, which was referred to in the oral opinion. However, the real act of insubordination which brought about the charges, trial, and penalty consisted in his refusal to follow the order to settle the strike on the terms that he himself had agreed to and to have the men return to work.

Underwood chose to violate the return-to-work order by going to court. He was not found guilty under this charge merely for bringing a lawsuit "qua" lawsuit, but, rather, for violating the duly executed lawful order of the General President, and his method of defiance and of violation was bringing a lawsuit "to test its validity."

In addition to the violation of his duties as president and member, Art. XXIII, Subdivision 3, Section (a), he violated Art. XXIII, Subdivision 7, Section (e), and was guilty of insubordination in refusing to follow the lawful command of those authorized within the International Union to issue the same. For this the General Executive Board had the power to discipline him, and upon the trial thereof and conviction therefor, to fine and suspend and expel him from the union.

Both Underwood and the local had a right to a hearing based on the above section and Article VI, Section 6, which provides:

> "Any and all members, Local Officers and Local Unions affected or aggrieved by any act or decision of the General President, may demand a hearing thereon before the General Executive Board, with appeal to the General Convention in the manner hereinafter prescribed."

This Court interprets the requirements of a hearing as including (1) written charges, (2) notice, (3) opportunity to present evidence and to be heard, (4) findings, (5) a decision, (6) but does not require the niceties of court

procedures, as set forth in the oral opinion. Substantial justice is the key.

The custom and constitutional provision against outside counsel is found to be reasonable and not violative of public policy, the constitution of the Union, or the law of the land. Art. XXIII, Subdivision 7, Section (n), reads:

"Complainants and defendants may present their own cases or by counsel selected from among the membership of the International Union of Operating Engineers."

The Court finds that Underwood was granted a hearing within the requirements above mentioned. The disciplinary action was reasonable, was taken in good faith, and in conformance with the Union's constitution. Substantively, the Court finds that the constitution as applied and the action thereunder was in full compliance with public policy, the Pennsylvania and Federal constitutions, and the law of the land.

Referring at this point briefly to the Dawson case, the order of supervision as issued was valid, and the summary imposition of supervision, with the subsequent right to a hearing, was absolutely necessary under the circumstances above outlined.

As already noted, from a substantive standpoint (substantive due process), the action was taken in good faith, was entirely reasonable, in full accord with public policy, the State and Federal constitutions, the Union constitution, and the law of the land. It failed only procedurally in the requirement of proper written charges to the membership and notice to the membership, opportunity to answer and properly present witnesses, and in imposing a presumption of guilt.

Referring again to the Underwood case, the Court need not go into grounds 2 and 3 for the Underwood suspension, since it finds that charge 1 warranted the action taken. However, the Court will proceed to a discussion of these grounds and the applicable law because of the importance of the case and for a better understanding of the problems involved.

 Underwood was charged with publishing defamatory literature against the General President by virtue of the allegations of the complaint of the lawsuit which were later dismissed with prejudice, in violation of Art. XVI, Section 1, of the Constitution, which provides:

" * * *. any Local Union, subdivision or member thereof publishing or circulating literature of a defamatory nature against any candidate for office, or officer, may be tried * * * and upon conviction, may be disciplined * * *."

Underwood was further found guilty of violation of Art. XVII, Section 3, which provides automatic penalties for bringing a suit "in any court by any member, officer or subdivision of the International Union of Operating Engineers until and unless all rights, remedies and provisions for hearing, trial and appeal within the Organization shall have been properly followed and exhausted * * *."

The Court reads the provision of the application for membership (D–1) "waiving any right to institute proceedings in court" in the light of the above provision and finds it to be valid. In that light it simply means that a member merely delays his right to go to court prior to exhausting his union remedies. There is no attempt, as I view the constitution, to insulate any member from access to the courts.

 As applied to the facts in this case that provision merely states that if Underwood wished to test the order of the General President, the proper place to do it was within the Union tribunals. At that point he was in no way financially aggrieved and had sustained no damages. In fact, had he obeyed the order, he would have continued in his official capacity as before. If aggrieved or if he felt aggrieved, the procedures were there for him to follow. Hence, since the

order was legal, and since Underwood was not damaged by it, he had a duty and a contract obligation to exhaust his internal remedies prior to seeking a means to test the validity of the order in the courts. Under the circumstances of this case, the Court finds the provision to be valid, although it does not hinge its decision on these charges.

Underwood sustained no damage until he was tried and convicted. At that point he sustained potential damages if he could satisfy a court of the validity of his cause. At that point jurisdiction was conferred upon the court without an exhaustion of internal remedies, but up to that point, since there was no damage or substantial property right involved, he had a duty to exhaust his internal remedies to test the order. Hence there is no inconsistency between a finding of jurisdiction in the court without exhaustion of internal remedies and a finding (which is not necessary for this decision) that his failure to exhaust his internal remedies at a time in which he had not sustained any personal damages constituted a violation of the Union constitution which could be punished by the Union. This factor is of paramount importance in a discussion of this phase of the case.

In this situation the Court is prepared to say, although not basing its decision on this point, that this case presents a situation wherein a Union member may be properly disciplined for bringing suit prior to exhausting his reasonable internal remedies in violation of his contract, even though his allegations and conduct during the suit may be privileged insofar as suits for libel and slander are concerned. It is the opinion of this Court that there is a gray area between absolute privilege against libel and slander and improper suspension for bringing suit in which a Union may properly discipline a member for failing to air his grievances internally prior to going to the courts. In the facts as presented in this case, where the party concerned had not been personally aggrieved, it is not unreasonable to ask him to keep the grievance within the organization before seeking the assistance of the courts. In this respect the Court takes cognizance of the importance of labor unions in our national structure and the fact that, as interpreted in the light of the facts of this case, reasonable restraints upon immediate access to the courts when a member has not been personally damaged might very well be beneficial to members and Union alike. Expulsion of an offending member is as much a matter of protection of the Union as it is a matter of discipline. The preservation of an organization properly acting under a valid constitution for the benefit of the membership is an extremely strong basis for a public policy which should not be overlooked in our desire to protect the rights of an expelled member. Both are equally important and should be equally protected, but when the group must suffer because of the unreasonable conduct of a member, the policy in favor of protection of the group would appear to be the more important one. Sanders v. International Ass'n of Bridge, 6 Cir., 1956, 235 F.2d 271.

The following cases are relied upon by the plaintiff for the proposition that a provision in a Union constitution providing reasonable penalties for refusing to exercise the stated internal remedies in order to redress his wrongs within his own organization prior to going to the courts is in all respects unreasonable, void, and against public policy, and therefore a nullity: Bernstein v. Alameda-Contra Costa Medical Ass'n, 1956, 139 Cal.App.2d 241, 293 P.2d 862. Spayd v. Ringing Rock Lodge, 1921, 270 Pa. 67, 113 A. 70, 14 A.L.R. 1443. Burke v. Monumental Division, No. 52, B. of L. E., D.C.D.Md.1919, 273 F. 707. Angrisani v. Stearn, 1938, 167 Misc. 728, 3 N.Y.S.2d 698, 701. St. Louis S. W. Ry. Co. of Texas v. Thompson, 1908, 102 Tex. 89, 113 S.W. 144. Thompson v. Grand International Brotherhood of L. E., 1905, 41 Tex.Civ.App. 176, 91 S.W. 834. Polin v. Kaplan, 1931, 257 N.Y. 277, 177 N.E. 833.

680

The Bernstein case involved a plaintiff expelled from a medical society for making unfavorable comment on an autopsy by another doctor, in which he stated that the other doctor was inexperienced and inept. He was found guilty of violating the American Medical Association constitutional provision reading, "When a physician does succeed another he should not disparage * * *."

The report was made in connection with a lawsuit and made to an attorney for one of the parties. The court noted that the plain intent of the provision was to prevent doctors criticizing preceding doctors to patients and did not refer to a situation of a doctor presenting a report to a court, even though the report was critical of the work of a preceding doctor.

The court further pointed out that it was not the intent of the constitution of the American Medical Association to arrogate and prescribe the duties of witnesses in judicial proceedings and prescribe penalties for violation of such duties. Quite obviously the intent of the constitution was not to cover the fact situation involved, and the expulsion was overturned on that particular ground. It was appealed on other grounds and sent back for a redetermination on a fact situation not involved in this case. It is quite obvious, however, in this case that the International Union of Operating Engineers constitution was plainly designed to cover the type of conduct engaged in by Underwood in this case.

It should be remarked at this point that the cases uniformly hold that where no power is given to a body in its constitution to discipline a member for certain stated acts, and the union attempts to discipline a member for acts not proscribed by its constitution, as in the Bernstein case above, courts have uniformly held such actions to be invalid.

In the Spayd case, supra [270 Pa. 67, 113 A. 72] plaintiff was expelled for signing a petition asking the legislature to reconsider the "Full Crew Law" which the national legislative representative of his union had supported. The constitution provided for expulsion of a member who opposed any acts taken on behalf of the union by said representative. The court in that case held that such a provision violated the plaintiff's right of free speech and his right under the Pennsylvania Constitution to petition the legislature and rejected the union contention that by virtue of his contract he delegated his personal right to petition the legislature to the group.

The court held that such a provision was completely violative of the provisions of the Pennsylvania Constitution. The court, however, in its opinion made no bald rejection of any possible limitations on personal freedom arrived at voluntarily, and which limitations are found to be reasonable. Under the union constitution in the Spayd case the union claimed its member could under no circumstances petition the legislature. Underwood, under the International constitution, could go to court, and the constitution said that he could go to court. He merely had to exhaust a remedy within the union, which he failed to do. He was accorded a hearing which he himself termed "fair," and he was disciplined under a provision in the constitution which he himself helped to write. See Bogadek v. Butkovic, 1939, 336 Pa. 284, 9 A.2d 388, opinion by Justice later Chief Justice Stern.

One sentence in the Spayd case, if taken out of context, might lend substance to plaintiff's argument in this case. I refer to the statement of Mr. Chief Justice Moschzisker, 270 Pa. at page 72, 113 A. at page 73, which reads as follows:

"We may add that a temporary giving up or denial of an inalienable right such as the one in hand is as void as though permanent in character."

Considered in the light of the true facts of that case, the "temporary" referred to was during his union membership, and it was the contention of the union that all during his membership he had delegated that power. That was

what the court struck down. That statement is inapplicable in this case because Underwood's rights were merely delayed by reason of his union membership, not extinguished, as in the Spayd case, by reason of union membership.

In the Burke case the plaintiff was expelled for bringing suit at the behest of the Pennsylvania Railroad to enjoin a general strike, on the ground that the Grand Chief did not have the power to call the strike. The basis of the expulsion was violation of a constitutional provision against interfering with a grievance which was in the hands of a union committee. It did not refer to the bringing of the action in court, but it was evident that that was the basis of his expulsion. The court held that the section involved was not intended to cover legal proceedings and stated, 273 F. at page 714:

> "Any intention to deny all access to the courts of the land will not be presumed. If it be enforceable at all, it must be unmistakably expressed."

It should be noted at this point that Underwood was not denied all access to the courts. He was merely required to air his grievance within an internal union tribunal.

Further, Underwood himself recognized that when afforded an opportunity to air his grievance, he had a fair opportunity, and hence there was no reason for him to believe that a fair hearing would not always be accorded him. In the International Union constitution the provision precluding the use of court remedies prior to exhausting internal remedies was unmistakably expressed in Art. XVII, Section 3. It is of interest at this point to point out that in the Burke case first mentioned the court expressed no opinion as to the validity of expulsion if he were charged with collaboration with his employers in that they financed his action. However, when he was properly charged with such collaboration, even though in good faith, and the expelled member believed that because of the presence of World War

I he was performing a patriotic duty, a subsequent expulsion was upheld by the same court in Burke v. Monumental Division, No. 52, Brotherhood of L. E., D.C.D.Md.1922, 286 F. 949.

In the Angrisani case the expelled member was charged with unjustly bringing a lawsuit against the union in violation of a constitutional provision providing that members who carried on any business of the union outside of the meetings or executive board rooms violated their obligations to the union and could be expelled. The court in that case held that from a plain reading of the language of the section there was no provision for expulsion for the institution of a lawsuit. The court read the language in general terms and refused to apply it to the bringing of an action. In the present case the provisions with respect to suit are clear and reasonable in the light of the fact that Underwood was not denied permanent access to the courts.

In the Thompson cases plaintiff was expelled on the ground that he violated the constitution of the union in urging a widow to sue the railroad for the death of her husband and for taking the stand as a witness in her behalf. The court held that as to the first question, with respect to the question as to whether the act itself violated the constitution, that was for the determination of the court only, but the second question as to the absence of good faith and presence of malice on the part of the hearing committee, was a question of fact which, in a case of that nature, must be submitted to the jury. However, the court did say that, as to the second question, if the constitution were considered as denying the member's right to take the stand and testify in a legal proceeding, such a provision was invalid and would not be enforced by the court.

▆ In the instant case there is absolutely no prohibition in the Union constitution that a member may not be a witness and may not himself institute suit in court. Its only limitation, and one which I consider reasonable, is that

when a member has a grievance against the Union, it requires him to attempt to correct that grievance on an internal level prior to taking his court action. Such a provision is completely reasonable and not in violation of any constitutional rights of the individual.

In the Polin case the plaintiff was expelled from the union for bringing a suit against the union and circulating literature based on the complaint filed in court. The expulsion was on the basis of the appeal section of the constitution, which set forth the methods of appeal within the union. The court in that case noted that the provision in question had nothing to do with expulsion per se from the union, but merely set forth a list of procedures, and restored him to membership. However, it is important to note, in arriving at the decision in question, the court recognized the doctrine of Weiss v. Musical Mutual Protective Union, 1899, 189 Pa. 446, 42 A. 118, which reads into the constitution an implied ground for expulsion where there is no express ground, "when a member has been guilty of some infamous offense, or has done some act tending to the destruction of the society," 189 Pa. at page 451, 42 A. at page 120. The court found that the conduct of Polin did not violate that implied provision and under the circumstances noted that the right to bring the action was absolute *in that particular fact situation.*

It is also important to note that the court recognizes that there is an area in which a union can properly discipline a member for bringing suit, even though such conduct might be privileged with respect to a libel and slander action. At page 835 of 177 N.E. the Court stated:

> "If the evidence given before the executive board, which we have not seen, established that the assertions made by the plaintiffs in the circulated statements, concerning the misconduct of the union officers, were *unfounded,* or were made maliciously without probable cause, and that they tended to the dis-

ruption of the union, we are not prepared to say that it would not have justified an expulsion. The difficulty is that the union did not expel the plaintiffs upon this charge."

■ I believe that statement to be good law. While any statements made in an action brought in any court of record are absolutely privileged with respect to libel and slander, I do not believe that any union member has an absolute privileged right to bring an action against the union based upon false statements maliciously made and without any probable cause.

In the Polin case the court approved that doctrine even in the absence of an express provision in the constitution against bringing suit prior to the exhausting of internal remedies. Though it is unnecesary for the purposes of this decision, since Underwood's suspension was justified on the ground of refusal to follow valid orders alone, this court likewise feels that a provision in a union constitution which would allow disciplinary action against a member under the conditions pointed out by Justice Kellogg in the Polin case, would be entirely reasonable, and the court notes that the facts presented in this case very nearly approach such a situation.

The plaintiff also cites the following cases as refuting the principle of law above enunciated: Wagner v. Bell, 1949, 70 Pa.Dist. & Co.R. 411; Yearsley v. Franklin Lamp Mfg. Co., 1929, 97 Pa. Super. 538; Matson v. Margiotti, 1952, 371 Pa. 188, 88 A.2d 892; Commonwealth v. Shipherd, 1945, 157 Pa.Super. 27, 41 A.2d 429; Kemper v. Fort, 1907, 219 Pa. 85, 67 A. 991, 13 L.R.A.,N.S., 820.

A close reading of these cases shows that each is inapposite to the facts of the present case.

In the Wagner case the principle of law enunciated is that relevant statements before an unemployment compensation board are absolutely privileged, since the proceedings are quasi-judicial.

In the Yearsley case the court held that a statement that the plaintiff was incompetent, made in a prior action over alleged nonpayment of wages, was relevant and pertinent to the issues and was privileged.

In Matson v. Margiotti, supra, the court merely upheld the principle that the actions of the Attorney General of Pennsylvania made in the course of his duties as Attorney General were absolutely privileged.

In the Commonwealth v. Shipherd case the Superior Court of Pennsylvania reversed the action of a lower court which refused to extend the coverage of the so-called "church cases" to unions. It held that testimony before a union board pertinent and relevant to the issue and not maliciously made constituted a qualified privilege for which there could be no prosecution. The net effect of this case is a strong, implicit recognition of the validity and sanction of International Union trials. The court further remarked that the peaceful disposition of matters relating to International Union affairs in an organization of employees formed to further the interest of the member with respect to higher wages and improved labor conditions, and so forth, is essential for the attainment of its objectives and for the retention of public confidence.

In the Kemper v. Fort case the court simply repeats the correct rule of law that when alleged libelous matter in pleadings is relevant and pertinent to the issue of a case, there is no liability for uttering it. The case has no application to a situation where a party has bound himself by the provisions of a contract which contains mutual benefits to both parties, and certainly does not stand for the proposition that a reasonable regulation which attempts to work out matters internally before going to court is unreasonable, unconstitutional, and void. For an excellent discussion of this phase of the case, see Hall v. Morrin, Mo.App.1927, 293 S.W. 435, 439, 440.

It follows, therefore, from what has been said in the oral opinion and in this supplemental opinion, that the order entered by the court in this case properly resolves the equities between Underwood, the local union, and the International Union of Operating Engineers.